Filed 7/31/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of MARIA B. | |
| DENISE B., as Conservator, etc., <br><br> Petitioner and Respondent, <br><br> v. <br><br> MARIA B., <br><br> Objector and Appellant. | G047889 <br><br> (Super. Ct. No. A235201) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Mary Fingal Schulte, Judge. Affirmed.

Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark S. Brown, Assistant Public Defender, and Kira Rubin, Deputy Public Defender, for Objector and Appellant.

Joseph M. Geis and Andrea Gee for Petitioner and Respondent.

As appellant Maria B.'s mother and limited conservator, Denise B. petitioned the trial court for an order authorizing her to consent to a hysterectomy and oophorectomy on Maria's behalf.[1]  Maria is a developmentally disabled adult who suffers from numerous health problems, including an abnormally long and heavy menses and debilitating migraine headaches that usually coincide with the onset of her menses.  After numerous other treatments for Maria's severe menstrual bleeding and migraines failed, her doctors recommended a hysterectomy and oophorectomy to treat Maria's condition.

The trial court found Probate Code section 2357 and its provisions regulating court-ordered medical treatment governed Denise's petition, rather than Probate Code section 1950 et seq. and its provisions regulating sterilization of developmentally disabled adults.[2]  As explained below, we agree section 2357 governs because the objective of the proposed surgery is to treat Maria's medical conditions, not to prevent her from bearing children.  Although the proposed surgery would result in Maria's sterilization, that is the incidental effect of the medically necessary treatment.

In deciding the merits of Denise's petition, the trial court found the preponderance of the evidence standard of proof applied instead of the more stringent clear and convincing evidence standard.  We conclude the trial court erred in doing so because the proposed surgery would have a substantial and irreversible impact on Maria's fundamental right to procreative choice.  Accordingly, the heightened standard of proof is required to protect that fundamental right and ensure the proposed surgery is truly a medical necessity.

We affirm the trial court's order granting Denise's petition, however, because Maria's counsel failed to show it is reasonably probable the trial court would

---

[1]     A hysterectomy is a surgical procedure to remove a woman's uterus and an oophorectomy removes her ovaries.

[2]     All statutory references are to the Probate Code unless otherwise stated.

have reached a different conclusion if it had applied the proper standard, and therefore failed to show the error was prejudicial.

## I

### FACTS AND PROCEDURAL HISTORY

Maria is a 25-year-old developmentally disabled adult who suffers from cerebral palsy, mild mental retardation, and hydrocephalus, which is an accumulation of excessive fluid in the brain. She functions academically and socially at approximately a first or second grade level and uses sign language to communicate because she is congenitally deaf. Denise is Maria's mother. In 2006, the trial court appointed Denise as the limited conservator of Maria's person and estate with the power to give and withhold medical consent on Maria's behalf.

To treat her hydrocephalus Maria has surgically implanted shunts that drain excess fluid from her brain to her abdominal cavity and thereby relieve some of the pressure in her head. The shunts, however, are susceptible to failure or infection and periodically have required surgical adjustment or relocation, although her current shunts can be moved without surgery using a special magnet.

Maria began her menses at age 11 and has experienced increasingly irregular menstrual cycles with excessive bleeding that lasts for an abnormally long period each cycle. Denise estimated Maria often would bleed 26 days per month, and frequently could not stand up without bleeding through her sanitary protection and clothing. Maria's condition caused her to experience low iron, chronic fatigue, bloating, and abdominal cramping.

In approximately 2008, Maria began having severe and debilitating migraine headaches. On a daily basis, Maria experienced headaches she rated a three on a scale from zero to 10, but more than 10 times per year she suffered severe migraines she rated a seven or eight on the same scale. The onset of these migraines caused Maria

3

to become weak and often collapse in pain, requiring numerous emergency room visits and six or seven hospitalizations. The migraines sometimes occurred when Maria's shunts failed or required relocation, but most of the time they coincided with the start of her period. Doctors at the hospital treated Maria with powerful pain medication, performed CAT scans to ensure her shunts were working properly, and then sent her home where she would sleep for a day or two. Maria worked with a pain management team at St. Joseph's Hospital and a specialist with the Department of Mental Health in an unsuccessful attempt to control the intense pain.

In 2009, Maria began seeing Dr. John W. Chen, a neurologist. To prevent her debilitating headaches, Chen prescribed Maria narcotic and prophylactic medications, and also referred Maria to neurosurgeons who performed multiple procedures to manipulate and adjust her shunts. Unfortunately, none of these treatments provided Maria any significant relief from her migraines. Because Maria's migraines usually coincided with her severe and lengthy menses, and because the change in hormone levels associated with a woman's menses can cause migraines, Chen recommended Maria see a doctor specializing in obstetrics and gynecology.

In 2010, Dr. Robert Borrowdale, an obstetrician and gynecologist, began treating Maria. Between February and July 2010, Borrowdale placed Maria on birth control pills to regulate her hormone levels and control her menses, but that treatment proved unsuccessful. In July 2010, Borrowdale performed a dilation and curettage on Maria to remove the lining of her uterus to reduce her bleeding. The procedure temporarily worked, but her bleeding soon resumed. Following the dilation and curettage procedure, Borrowdale prescribed a modified birth control pill regimen, but that too failed to curb Maria's excessive menstrual bleeding and severe migraines. In April 2011, Borrowdale stopped giving Maria birth control pills and prescribed Depo Provera, which is another form of birth control administered by an injection every 90 days.

4

The Depo Provera shots controlled Maria's menstrual bleeding and severe migraines for nine or 10 weeks, but her heavy bleeding and severe migraines would resume at that point. Maria would then have to endure the pain because she could not receive another shot until the end of the 90-day period. Consequently, she often had to visit the emergency room to obtain pain medication for the two or three weeks before she could receive her next shot. Moreover, Depo Provera only may be taken for approximately two years because it decreases the patient's bone density.

Having exhausted the less intrusive treatments described above, Borrowdale recommended Maria undergo a total hysterectomy. After consulting with Chen, Borrowdale revised his recommendation to also include an oophorectomy because the two doctors believed Maria's menstrual migraines were caused not only by her heavy bleeding but also the fluctuation in hormone levels caused by her ovaries.

Chen agreed a hysterectomy and oophorectomy offered Maria a viable treatment option because several of his other patients obtained migraine relief after undergoing those procedures. Without the hysterectomy and oophorectomy, Chen testified he would continue to treat Maria in the same manner — using various medications and dosages to treat Maria's pain and prevent her migraines. This treatment also would require adjusting or relocating her shunts as needed. That course of action, however, concerned Chen. He explained prolonged use of these medications could cause liver or kidney failure, the repeated CAT scans required to examine the shunts would expose Maria's brain to increased radiation levels, and the repeated shunt adjustments would increase the risks of bleeding in her head.

Both Borrowdale and Chen discussed the proposed surgery with Maria, explaining the hysterectomy and oophorectomy could potentially help with her headaches, but would permanently prevent her from having children. Maria told both doctors she wanted the surgery performed.

In July 2012, Denise petitioned the trial court for an order authorizing her, as Maria's conservator, to consent to a hysterectomy and oophorectomy on Maria's behalf. Denise brought the petition under section 2357, which governs court ordered medical treatment. After several continuances, the court conducted a two-day trial on the petition in December 2012. Denise, Chen, and Borrowdale testified to the foregoing facts in support of the petition.

Acting as Maria's appointed counsel, the public defender opposed the petition on the grounds that (1) section 1950 et seq., regarding sterilization of developmentally disabled persons, provided the controlling statutory procedures for the petition; (2) Maria lacked the capacity to provide informed consent for the proposed surgery; and (3) Denise failed to show by clear and convincing evidence that the proposed surgery was medically necessary. The only witness the public defender called was Dr. Thomas J. Grayden, a forensic psychiatrist who interviewed Maria shortly before trial. Grayden opined Maria met the criteria for schizophrenia and lacked the capacity to consent to the hysterectomy and oophorectomy. He also submitted a report describing Maria as suicidal and lacking mental stability. During closing argument, Maria asked to speak and asserted, "I want the surgery, I want the – I want it removed. I have headaches, no periods."

The trial court took the matter under submission and later issued a detailed ruling granting the petition. The court found section 2357 provided the controlling authority because Denise sought to obtain medical treatment for Maria's condition and sterilization was only an incidental effect of the treatment. The court further found the preponderance of the evidence standard was the controlling burden of proof and Denise presented sufficient evidence under that standard to show (1) Maria's medical condition "requires the recommended course of treatment"; (2) "there is a probability that the continuance of this condition will result in a serious threat to the mental health of Maria";

and (3) "Maria lacks the capacity to give an informed consent to this particular recommended course of treatment."

The trial court clerk forwarded the trial court's ruling to this court as an automatic appeal under section 1962, subdivision (b), and California Rules of Court, rule 8.482. Later, the trial court requested that we dismiss this appeal because it erred in treating the matter as an automatic appeal. We invited the parties to brief the issue. After considering the briefs, we elected to review the matter as an automatic appeal on an expedited schedule.

## II

### DISCUSSION

A. *Legal Background*

We must first decide whether Denise's petition falls under the provisions of section 2357 or section 1950 et seq. Section 2357 is part of the Probate Code chapter concerning the powers and duties of a guardian or conservator of the person. The statute allows a guardian or conservator to petition for a court order authorizing medically necessary treatment for a ward or conservatee when (1) the ward or conservatee is unable to give informed consent for the treatment and (2) the guardian or conservator lacks authority to consent on the ward or conservatee's behalf without a court order.[3] (§ 2357, subd. (b).) Under section 2357 the court must appoint the public defender or a private attorney "to consult with and represent the ward or conservatee at the hearing on the

---

[3]     Section 2357, subdivision (b), states as follows: "If the ward or conservatee requires medical treatment for an existing or continuing medical condition which is not authorized to be performed upon the ward or conservatee under Section 2252, 2353, 2354, or 2355, and the ward or conservatee is unable to give an informed consent to this medical treatment, the guardian or conservator may petition the court under this section for an order authorizing the medical treatment and authorizing the guardian or conservator to consent on behalf of the ward or conservatee to the medical treatment."

7

petition." (§ 2357, subd. (d).) The court may grant the petition "if the court determines from the evidence all of the following: [¶] (1) The existing or continuing medical condition of the ward or conservatee requires the recommended course of medical treatment. [¶] (2) If untreated, there is a probability that the condition will become life-endangering or result in a serious threat to the physical or mental health of the ward or conservatee. [¶] (3) The ward or conservatee is unable to give an informed consent to the recommended course of treatment." (§ 2357, subd. (h).)

Section 1950 et seq. is a separate Probate Code chapter that only addresses requests to sterilize a developmentally disabled adult. The comprehensive statutory scheme recognizes the fundamental nature of every person's "right to exercise choice over matters of procreation," including the right to choose sterilization, and establishes detailed procedures to ensure "no individual [is] sterilized solely by reason of a developmental disability and that no individual who knowingly opposes sterilization [is] sterilized involuntarily." (§ 1950.)

Under this statutory scheme, the conservator of an adult, or any person allowed to petition for appointment of a conservator, may file a petition for "appointment of a limited conservator authorized to consent to the sterilization of an adult with a developmental disability." (§ 1952.) If the person named in the petition has not retained legal counsel and does not plan to do so, the court must immediately appoint the public defender or a private attorney to represent the person and "undertake the representation with the presumption that the individual opposes the petition." (§ 1954.) The court also must appoint a facilitator for the person named in the petition to help the person understand the nature of the proceedings so the person may participate as fully as possible. (§ 1954.5.) Two physicians and a psychologist or clinical social worker must conduct "comprehensive medical, psychological, and sociosexual evaluations of the individual" and prepare a written report for the court and all parties. (§ 1955.)

8

After receiving the report and the evidence, the court may grant the petition "only if the court finds that the petitioner has established all of the following beyond a reasonable doubt:" (1) the person named in the petition lacks the capacity to consent to the sterilization and that lack of capacity is likely permanent; (2) the person is fertile and capable of procreation; (3) the person is capable of engaging in sexual activity under circumstances likely to result in pregnancy; (4) either (a) the person's disability renders him or her permanently incapable of caring for a child even with training and assistance, or (b) pregnancy or childbirth would pose a substantially elevated risk to the person's life so that sterilization would be deemed medically necessary for a nondisabled person under similar circumstances; (5) all less invasive contraceptive methods are unworkable; (6) the sterilization method proposed entails the least intrusion of the person's body; (7) current scientific and medical knowledge does not suggest either (a) a reversible sterilization procedure or less drastic contraceptive method will be available shortly, or (b) "science is on the threshold of an advance in the treatment of the individual's disability"; and (8) the person has not made a knowing objection to the sterilization. (§ 1958.) A court must issue a statement of decision for any order granting a petition and "an appeal is automatically taken by the person proposed to be sterilized without any action by that person, or by his or her counsel." (§ 1962.)

B.      *Section 2357 Provides the Controlling Standards and Procedures*

Maria's counsel contends section 1950 et seq. governs Denise's petition because the proposed hysterectomy and oophorectomy will result in Maria's sterilization. She argues the purpose of the proposed surgery is irrelevant if sterilization is a probable consequence of the procedure. We disagree. By its express terms, the application of section 1950 et seq. depends on whether the purpose of the proposed medical procedure is sterilization or a medically necessary treatment of a separate ailment. A court therefore must examine the purpose of the procedure, not its incidental effects.

9

"In reviewing a statute, '"[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the statutory language is unambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." [Citation.]' [Citation.]" (*Wolski v. Fremont Investment & Loan* (2005) 127 Cal.App.4th 347, 351.) "'Issues of statutory interpretation are questions of law subject to our independent or de novo review. [Citations.]' [Citations.]" (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd.* (2010) 187 Cal.App.4th 808, 820.)

Section 1968 states, "This chapter does not prohibit medical treatment or surgery required for other medical reasons and in which sterilization is an unavoidable or medically probable consequence, but is not the object of the treatment or surgery." Moreover, section 1961 provides, "A sterilization procedure authorized under this chapter shall not include hysterectomy or castration. However, if the report prepared under Section 1955 indicates that hysterectomy or castration is a medically necessary treatment, regardless of the need for sterilization, the court shall proceed pursuant to Section 2357."

When these two sections are read together, their language unambiguously establishes the proposed medical procedure's purpose dictates whether a petition for court approval must proceed under section 1950 et seq. or section 2357. The petition must proceed under section 1950 et seq. if the procedure's objective is to sterilize the individual. (Cf. *Conservatorship of Angela D.* (1999) 70 Cal.App.4th 1410, 1419 (*Angela D.*) [applying section 1950 et seq. to application for court order authorizing sterilization of a developmentally disabled woman because a pregnancy "would be devastating and perhaps fatal" to the woman and the fetus].) The petition must proceed under section 2357, however, if the procedure's objective is to treat a medical condition and sterilization is merely a secondary effect. (Cf. *Maxon v. Superior Court* (1982)

10

135 Cal.App.3d 626, 628, fn. 2 (*Maxon*) [applying section 2357 to an application for a court order authorizing a hysterectomy to treat cervical cancer].)

Maria's counsel provides no authority or interpretation of sections 1961 and 1968 to support the contention section 1950 et seq. applies to all medical procedures that could result in sterilization. Instead, Maria's counsel focuses on the numerous procedures and protections section 1950 et seq. provides without explaining why they apply in this case. Counsel's only argument regarding section 1968 is that the section does not prevent section 1950 et seq. from applying in this case because the proposed medical procedures are merely recommendations rather than medical requirements. This argument misses the mark. Whether the proposed procedures are medically necessary speaks to the petition's merits, not to which of the two statutory schemes applies to the petition.

There is no dispute the purpose for the proposed hysterectomy and oophorectomy is to treat Maria's severe menstrual migraines and bleeding; sterilization is a secondary effect of a necessary medical procedure designed only to alleviate Maria's suffering. Indeed, Maria's counsel does not argue or offer any evidence to show Denise sought court approval for the surgery for any reason other than treating Maria's migraines and bleeding. Accordingly, we conclude section 2357 governs Denise's petition and we therefore review the trial court's ruling based on that section.

C. *The Trial Court Erred In Applying the Preponderance of the Evidence Standard of Proof*

In deciding the petition, Maria's counsel asked the trial court to apply the clear and convincing evidence standard of proof. Unfortunately, Maria's counsel failed to cite any authority or otherwise explain why that standard applied. The trial court rejected the request and applied the preponderance of the evidence standard of proof because the court found nothing in section 2357 suggested the clear and convincing evidence standard applied. We conclude the trial court erred because the impact the

11

proposed hysterectomy and oophorectomy would have on Maria's fundamental procreative rights requires the heightened standard of proof to ensure the surgery is medically necessary under section 2357.

"The function of a standard of proof is to instruct the fact finder concerning the degree of confidence our society deems necessary in the correctness of factual conclusions for a particular type of adjudication, to allocate the risk of error between the litigants, and to indicate the relative importance attached to the ultimate decision. [Citation.]  Thus, 'the standard of proof may depend upon the "gravity of the consequences that would result from an erroneous determination of the issue involved."' [Citation.]"  (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546 (*Wendland*).)  "The required minimum standard reflects a 'societal judgment about how the risk of error should be distributed between the litigants.' [Citation.]"  (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1556 (*Jason K.*).)  Choosing the applicable standard of proof is a question of law we review de novo.  (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584.)

Under the preponderance of the evidence standard, the parties share the risk of an erroneous factual determination "'in roughly equal fashion.'"  (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1556.)  "The beyond a reasonable doubt standard is 'designed to exclude as nearly as possible the likelihood of an erroneous judgment' and 'imposes almost the entire risk of error upon [the party bearing the burden of proof].'  [Citation.]" (*Ibid.*)  The clear and convincing evidence standard represents an "intermediate standard" that increases the burden on the party seeking relief and thereby reduces the risk of error to the opposing party.  (*Ibid.*)  Specifically, "[t]he 'clear and convincing evidence' test requires a finding of high probability, based on evidence ""'so clear as to leave no substantial doubt' [and] 'sufficiently strong to command the unhesitating assent of every reasonable mind.'"'  [Citations.]"  (*Wendland*, *supra*, 26 Cal.4th at p. 552.)

12

Section 2357 is silent on which standard of proof applies to a petition authorizing the conservator to consent to medical treatment on a conservatee's behalf.[4] "The default standard of proof in civil cases is the preponderance of the evidence." (*Wendland*, *supra*, 26 Cal.4th at p. 546; see Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence"].) Courts nonetheless apply the heightened clear and convincing evidence standard in a variety of civil cases when certain important or fundamental rights are at stake. (*Wendland*, at pp. 546, 555; see also *Jason K.*, *supra*, 188 Cal.App.4th at pp. 1556-1557.)

For example, the clear and convincing evidence standard applies in actions to (1) sterilize a developmentally disabled adult conservatee; (2) withhold artificial nutrition and hydration from an incompetent adult conservatee; (3) appoint a conservator based on a person's inability to provide for his or her personal needs; (4) permit involuntary electroconvulsive therapy; (5) civilly commit a person to a mental hospital; (6) terminate parental rights; (7) deport a person; and (8) discipline a judge. (*Wendland*, *supra*, 26 Cal.4th at pp. 546-547; *Jason K.*, *supra*, 188 Cal.App.4th at pp. 1556-1557; see also 1 Witkin, Cal. Evidence (5th ed. 2012) Burden of Proof and Presumptions, § 40, pp. 212-214.)

In *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143 (*Valerie N.*), the California Supreme Court held a person's right to procreative choice is a fundamental right that requires courts to apply the clear and convincing evidence standard in actions seeking authorization to sterilize a developmentally disabled conservatee. (*Id.* at pp. 161-164.) *Valerie N.* considered the constitutionality of former section 2356, subdivision (d), which effectively denied incompetent conservatees the right to choose

---

[4]  In contrast, section 1958 requires a trial court to apply the beyond a reasonable doubt standard of proof when deciding a petition under section 1950 et seq. for a court order to sterilize a developmentally disabled adult.

13

sterilization as a method of contraception by prohibiting their conservators from consenting to sterilization on their behalf.[5]  The Supreme Court found the statute constitutionally overbroad because "[t]rue protection of procreative choice can be accomplished only if the state permits the court-supervised substituted judgment of the conservator to be exercised on behalf of a conservatee who is unable to personally exercise this right."  (*Valerie N.*, at p. 168.)

The *Valerie N.* court urged the Legislature to pass legislation allowing a conservator to consent to sterilization on his or her incompetent conservatee's behalf, but also providing criteria and procedures to ensure the conservatee is sterilized for an appropriate reason, not merely because he or she is incompetent or developmentally disabled.[6]  In the interim, the Supreme Court explained section 2357's procedures for approving intrusive medical treatments should be adapted and applied to requests for authorization to sterilize an incompetent conservatee.  One of the adaptations the *Valerie N.* court identified as necessary to protect the conservatee's fundamental right to procreative choice required the conservator to present clear and convincing evidence of the need for sterilization.  (*Valerie N.*, *supra*, 40 Cal.3d at p. 168.)

In *Maxon*, the court held a conservatee's fundamental right to procreative choice required the conservator to present clear and convincing evidence of the need for a medical procedure to treat a potentially life-threatening condition, but would result in the conservatee's sterilization.  Specifically, the conservator petitioned for authorization to consent to a hysterectomy for her conservatee because the conservatee had been diagnosed with cervical cancer and three doctors recommended the surgery to prevent the

---

[5]     Former section 2356, subdivision (d), provided, "No ward or conservatee may be sterilized under the provisions of this division."  (Former § 2356, subd. (d).)

[6]     In response to *Valerie N.*, the Legislature enacted section 1950 et seq.  (*Angela D.*, *supra*, 70 Cal.App.4th at pp. 1416-1417.)

14

cancer from becoming malignant. (*Maxon*, *supra*, 135 Cal.App.3d at p. 628.) The trial court found clear and convincing evidence showed the surgery was medically necessary, but the court denied the petition because it found former section 2356, subdivision (d)'s prohibition against sterilizing incompetent conservatees prevented the court from granting the petition. (*Maxon*, at pp. 631, 634.)

The Court of Appeal reversed, finding section 2356, subdivision (d), did not apply because "the purpose of the proposed surgery [was] to protect the life of the incompetent rather than to prevent her from bearing children." (*Maxon*, *supra*, 135 Cal.App.3d at p. 633.) As for the standard of proof, the *Maxon* court found the petition "must be supported by clear and convincing evidence of the medical necessity for the operation . . . [b]ecause we view a hysterectomy as a serious and intrusive invasion of [the conservatee's] right of privacy." (*Id*. at pp. 633-634.) The court further explained, "[a]n elevated standard of proof in a proceeding to determine whether or not such an operation is of 'medical necessity' will lessen the possible risk that a factfinder might decide to sterilize an individual on unsubstantiated testimony or discredited eugenic theories." (*Id*. at p. 634.) The *Maxon* court concluded the trial court should have granted the petition because clear and convincing evidence supported the court's finding the surgery was medically necessary to treat the conservatee's cervical cancer. (*Ibid*.)

Here, we conclude the clear and convincing evidence standard is required to protect Maria's fundamental right to procreative choice. Although the objective of the proposed hysterectomy and oophorectomy is to treat Maria's severe menstrual migraines and bleeding, the surgery would have a substantial and irreversible impact on her right to procreative choice by denying her the opportunity to bear children. Denise therefore must present clear and convincing evidence to show the surgery is medically necessary under section 2357. We do not suggest the clear and convincing evidence standard is required on all section 2357 petitions. As the trial court stated, nothing in the statute suggests that result. Rather, we merely require the clear and convincing evidence

15

standard in this case because the proposed medical treatment significantly impacts a fundamental right. The appropriate standard in every case will depend on the specific medical procedure proposed and whether it impacts a fundamental right, but the clear and convincing standard will be the exception rather than the norm.

We emphasize the purpose of requiring a heighted burden of proof in this case is not to prevent Denise from obtaining medical treatment for Maria that could potentially provide Maria some relief from her severe menstrual migraines and bleeding. Rather, the purpose is to (1) emphasize the importance of the decision that would substantially affect Maria's fundamental right to procreative choice, and (2) place the risk of any error in making that decision on an outcome that would not impact the fundamental right at issue and could later be changed. (See *Wendland*, *supra*, 26 Cal.4th at pp. 546-547 [purpose of heightened standard of proof includes emphasizing importance of underlying decision and adjusting the risk of error to protect the fundamental right at stake].)

For example, if the trial court erred in finding the proposed surgery was not medically necessary and erroneously denied the petition, Maria would retain the ability to bear children and Denise could file a new petition after obtaining further medical evidence to support the need for the surgery. But if the trial court mistakenly concluded the proposed surgery was medically necessary, Maria would lose the ability to bear children and that outcome could not be altered. (See *Wendland*, *supra*, 26 Cal.4th at p. 547 [involving petition for authorization to remove life-sustaining treatment].) We acknowledge Maria would continue to suffer from her severe menstrual migraines and bleeding in the first scenario, but Denise could rectify this result by making a more comprehensive showing regarding the medical need for the surgery. Moreover, if the surgery is truly a medical necessity, Denise should be able to present sufficient evidence to establish that fact by clear and convincing evidence. We emphasize the clear and convincing evidence standard is higher than the preponderance of the evidence standard,

16

but lower than the beyond a reasonable doubt standard the Legislature requires when the medical procedure's objective is to sterilize the conservatee. (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1556; § 1958.)

Denise contends neither *Valerie N.* nor *Maxon* required the trial court to apply the clear and convincing evidence standard. According to Denise, *Valerie N.* is distinguishable because there the objective of the proposed medical procedure was to sterilize the conservatee, but the objective of the proposed medical procedure here is to treat Maria's severe menstrual migraines and bleeding. The analysis regarding the appropriate standard of proof, however, examines the nature of the right that would be affected, not the objective of the proceedings that would affect the right.[7] (*Jason K.*, *supra*, 188 Cal.App.4th at pp. 1556-1557 ["To determine whether a proof standard meets this constitutional minimum, the courts evaluate . . . the private interest affected by the proceeding"]; see also *Wendland*, *supra*, 26 Cal.4th at pp. 546-547.) For instance, the *Maxon* court applied the clear and convincing evidence standard based on the significant impact the proposed medical procedure would have on the conservatee's fundamental right to procreation even though the procedure's objective was to treat a potentially life-threatening medical condition. (*Maxon*, *supra*, 135 Cal.App.3d at pp. 633-634.)

In Denise's view, the *Maxon* court's discussion regarding the clear and convincing evidence standard of proof is dicta because the issue in *Maxon* was whether former section 2356, subdivision (d), prevented the trial court from granting the petition for authorization to consent on the conservatee's behalf. Denise is mistaken. After determining former section 2356, subdivision (d), did not apply, the *Maxon* court necessarily discussed the governing standard of proof to determine whether the trial court

---

[7] We acknowledge our foregoing determination regarding whether section 2357 or section 1950 et seq. governed Denise's petition relies on Denise's objective in bringing the petition, but that conclusion turned on statutory interpretation principles, not standard of proof principles.

17

applied the correct standard in finding the proposed surgery was medically necessary and whether the evidence supported that finding. (*Maxon*, *supra*, 135 Cal.App.3d at p. 634 ["Our review of the record before us indicates that the trial judge applied the appropriate standard and that his findings are overwhelmingly supported by clear and convincing evidence"].) The *Maxon* court could not have reached it decision directing the trial court to grant the petition without addressing the appropriate standard of proof.

Denise also contends the Supreme Court's *Wendland* decision requires us to apply the preponderance of the evidence standard, but she misconstrues the significance of that decision. *Wendland* involved a conservatee's fundamental right to refuse medical treatment, including life-sustaining artificial nutrition and hydration, and a conservator's exclusive authority under section 2355 to make healthcare decisions for an incompetent conservatee. (*Wendland*, *supra*, 26 Cal.4th at pp. 530-533, 538-541.) Section 2355 requires the conservator to make all healthcare decisions for a conservatee consistent with any formal healthcare instructions or informal wishes the conservatee expressed while still competent. If a conservatee left no indication regarding his or her wishes, section 2355 requires the conservator to make decisions based on the conservatee's best interest. (§ 2355, subd. (a).)

In *Wendland*, the conservator petitioned the court for authorization to withdraw artificial nutrition and hydration from an incompetent conservatee who suffered a brain injury, but was conscious and not terminally ill. (*Wendland*, *supra*, 26 Cal.4th at pp. 523-524.) The Supreme Court concluded the conservator must present clear and convincing evidence showing the withdrawal of life sustaining treatment was consistent with the conservatee's wishes or best interests, but concluded the conservator had failed to make the requisite showing. (*Id*. at pp. 546-548, 554.) In reaching that decision, the court acknowledged the Law Revision Commission comment to section 2355 stated the default preponderance of the evidence standard should apply to section 2355 petitions because the statute does not specify any special evidentiary standard. Nonetheless, the

18

*Wendland* court found the clear and convincing evidence standard applied because it involved the conservatee's fundamental right to refuse life-sustaining treatment. (*Wendland*, at pp. 542-543, 555.) The Supreme Court, however, limited its holding to the specific facts of the case, explaining "we see no constitutional reason to apply the higher evidentiary standard to the majority of health care decisions made by conservators not contemplating a conscious conservatee's death." (*Id*. at pp. 543, 555.)

Denise relies on this statement to support her contention we must apply the preponderance of the evidence standard because Denise's petition did not request authorization to withdraw life-sustaining treatment. *Wendland*, however, construed section 2355, not section 2357, and nonetheless supports our conclusion the clear and convincing evidence standard applies to Denise's petition. Indeed, despite its conclusion "the vast majority of health care decisions made by conservators under section 2355" are governed by the preponderance of the evidence standard, the *Wendland* court applied the clear and convincing evidence standard because the petition at issue affected the conservatee's fundamental right to refuse medical treatment. (*Wendland*, *supra*, 26 Cal.4th at pp. 543, 555.) As explained above, a conservatee's right to procreative choice also is a fundamental right that requires application of the clear and convincing evidence standard. Accordingly, even though the two cases involve different fundamental rights, *Wendland* supports our conclusion the clear and convincing evidence standard applies.

Finally, Denise argues we should apply the preponderance of the evidence standard because it allows us to balance the competing interests in this case, namely, Maria's right to procreative choice and her right to receive medical treatment. Denise's reliance on *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, is inapposite, however. *Hill* involved a cause of action for violation of the California Constitution's right to privacy based on the National Collegiate Athletic Association's requirement that collegiate athletes submit to random drug tests. (*Id*. at pp. 8-9.) *Hill* did not address the

19

appropriate standard of proof in a proceeding seeking court approval for a medical treatment or other action that would affect a person's fundamental rights. Moreover, the statement Denise cites regarding the preponderance of the evidence standard is from a dissenting opinion. (*Id*. at pp. 85-86 (dis. opn. of Mosk, J.).)

D.      *Maria's Counsel Failed to Show the Trial Court's Error Was Prejudicial*

Although the trial court erred, we may not reverse the trial court's order granting Denise's petition unless Maria's counsel shows it is reasonably probable the trial court would have denied the petition had it applied the correct standard of proof. We affirm the trial court's order granting the petition because Maria's counsel failed to make this required showing.

California's Constitution provides, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see also Code Civ. Proc., § 475.)

"'The effect of this [constitutional] provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the [appellant]. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal depends on the circumstances in each case.' [Citation.] [¶] The phrase 'miscarriage of justice' has a settled meaning in our law, having been explained in the seminal case of *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243 (*Watson*). Thus, 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable

20

that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, original italics (*Cassim*).)

The *Watson* standard applies in both criminal and civil cases, and requires appellate courts to "examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' [Citations]." (*Cassim*, *supra*, 33 Cal.4th at pp. 801-802.) Under this standard, the appellant bears the burden to make an "affirmative showing" the trial court committed error *and* that error resulted in a miscarriage of justice. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963; see *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308.)

Here, Maria's counsel failed to explain how the result would have been any different if the trial court applied the clear and convincing evidence standard of proof instead of the preponderance of the evidence standard. At trial, Denise bore the burden to present evidence establishing (1) Maria's medical condition "requires the recommended course of medical treatment"; (2) if Maria's condition remains untreated, "there is a probability that the condition will become life-endangering or result in a serious threat to [Maria's] physical or mental health"; and (3) Maria "is unable to give an informed consent to the recommended course of treatment." (§ 2357, subd. (h).)

To meet this burden Denise presented her own testimony and testimony from Chen and Borrowdale describing Maria's severe menstrual migraines and bleeding, the numerous unsuccessful treatments the two doctors attempted, the proposed hysterectomy and oophorectomy as the next step in Maria's treatment, the risks associated with continuing the current course of treatment without the surgery, and Maria's desire to have the surgery performed. The only witness Maria's counsel called was Grayden, who testified concerning his opinion that Maria lacked the capacity to

21

consent to the proposed hysterectomy and oophorectomy. Maria's counsel called no witnesses to rebut the evidence regarding Maria's severe menstrual bleeding and migraines or the threat her condition posed to her health. Although Maria's counsel criticized Denise for failing to try other less intrusive treatments before seeking court approval for the proposed hysterectomy and oophorectomy, Maria's counsel failed to present any evidence to show other less intrusive treatments had not been tried.

Maria's counsel now argues the proposed hysterectomy and oophorectomy was merely a "recommendation, not a requirement," but counsel misconstrues the required showing under section 2357. Section 2357 requires the party seeking court approval to present evidence establishing the medical condition "requires the recommended course of medical treatment." (§ 2357, subd. (h)(1).) That is precisely the finding the trial court made based on Denise's evidence and Maria's counsel did not present any evidence to rebut that finding.

Accordingly, we affirm the trial court's ruling granting Denise's petition despite the court's application of the incorrect standard of proof. Maria's counsel failed to satisfy Maria's burden to show the trial court's error caused Maria actual prejudice. Based on our review of the record, we conclude Denise's unrebutted evidence regarding Maria's medical condition, the need for the proposed hysterectomy and oophorectomy, and the consequences for Maria if she did not have the surgery amount to clear and convincing evidence supporting the trial court's decision to grant Denise's petition. The trial court's lengthy and detailed decision demonstrates the court carefully considered all of the evidence in making the required findings under section 2357, subdivision (h). Without some evidence to rebut Denise's evidence, Maria's counsel cannot establish a reasonable probability the trial court would have denied the petition under the heightened clear and convincing evidence standard.

Although not raised by Maria's counsel, we note the trial court's application of the incorrect standard of proof does not amount to structural error requiring

22

automatic reversal. As explained above, an appellant generally is not entitled to a reversal unless he or she shows not only that the trial court erred, but also that the trial court's error actually prejudiced the appellant and resulted in a miscarriage of justice. That standard, however, does not apply when the trial court's error violates the United States Constitution and involves a defect in the trial mechanism that affects the framework within which the trial proceeds rather than simply an error in the trial process. (*Cassim*, *supra*, 33 Cal.4th at p. 801, fn. 6; *In re Angela C.* (2002) 99 Cal.App.4th 389, 394.) When a trial court's error amounts to structural error, reversal is required without regard to the strength of the evidence or other circumstances. (*In re Enrique G.* (2006) 140 Cal.App.4th 676, 685.)

In the civil context, structural error typically occurs when the trial court violates a party's right to due process by denying the party a fair hearing. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 8:309, p. 8-190 (rev. # 1, 2011) (Eisenberg et al., Civil Appeals and Writs).) Structural errors requiring automatic reversal include denying a party's request for a jury trial (*Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 697-698) and violating a party's right to present testimony and evidence (*Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290-291). (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 579 ["In our view, if a civil litigant was permitted to introduce evidence, cross-examine witnesses, and present argument before a fairly selected jury that rendered its honest verdict on the trial record, there has been no 'structural [defect] in the constitution of the trial mechanism' that might call for automatic reversal of a civil judgment without consideration of actual prejudice"].)

Previous cases involving the erroneous application of the preponderance of the evidence standard rather than the clear and convincing evidence standard have not found structural error requiring automatic reversal. Instead, the reported cases have analyzed the error under the *Watson* standard and required a showing it was reasonably

23

probable the appellant would have achieved a more favorable result under the proper standard of proof. (See, e.g., *People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1257, fn. 7; *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 488; *Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 620-621.)

## III

### DISPOSITION

The order is affirmed. Based on the parties' stipulation at oral argument, this opinion shall be final as to this court 10 days after it is filed. The clerk of this court is directed to immediately issue the remittitur upon finality. (Cal. Rules of Court, rule 8.272(c)(1); Eisenberg et al., Civil Appeals and Writs, *supra*, ¶¶ 11:192-11:193, p. 11-81; ¶ 14:24, pp. 14-5 to 14-6 (rev. # 1, 2012).) In the interest of justice, the parties shall bear their own costs on appeal.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.