Filed 11/23/21 In re E.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.D., a Person Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.D., <br><br> Defendant and Appellant. | F083112 <br><br> (Merced Super. Ct. No. 20JP-00041-A) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Merced County. Brian McCabe, Judge.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Jennifer Trimble, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant M.D. (Mother) is the mother of the child E.D., who is the subject of a dependency case. Mother challenges the juvenile court's orders issued at a contested selection and implementation hearing that resulted in mother's parental rights being terminated. Mother contends the juvenile court committed reversible error by applying the incorrect standard of proof when it found that mother failed to meet her burden to establish the beneficial parent-child relationship exception to adoption. She also asserts that the juvenile court erred by considering the relative caregiver's willingness to allow ongoing contact between Mother and E.D. in relation to the exception. Finding no prejudicial error in the juvenile court's orders, we affirm.

## FACTS

### Initial Removal

On April 17, 2020, the Merced County Human Services Agency (Agency) received a suspected child abuse report after Mother gave birth to E.D. at a local hospital. A report was made due to Mother's extensive case history with the Agency, which involved multiple removals of her adopted daughter, A.D. (sister). Law enforcement took E.D. into protective custody based upon the Agency's concerns that E.D. was at substantial risk of general neglect and physical harm.

The Agency filed an original petition alleging E.D. was a child described by Welfare and Institutions Code section 300, subdivisions (b)(1), (g), and (j).[1] The petition alleged that E.D. was at risk due to Mother's history of physical abuse and neglect of the sister, who was involved in an ongoing dependency case.

The report prepared for the April 22, 2020, detention hearing detailed Mother's eight prior child welfare referrals and the sister's three separate removals from Mother's care. The sister was removed in June of 2016 due to Mother's absence, February of 2018 due to physical abuse by Mother, and February of 2020 due to concerns of physical abuse by

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

Mother. Mother contested the recommendation to detain E.D., and she testified that she did not cause the injuries that resulted in the removal of the sister on two separate occasions. At the detention hearing held April 24, 2020, the juvenile court ordered that E.D. was to remain out of Mother's care, and it set a jurisdiction and disposition hearing for May 21, 2020.

**Jurisdiction and Disposition**

The Agency filed a Jurisdiction Report after the matter was continued due to the COVID-19 pandemic. E.D. had been placed with a relative, and Mother had not yet been interviewed for purposes of the report. The report also provided further details surrounding Mother's prior dependency cases involving general neglect and physical abuse of the sister. As to jurisdiction, the Agency recommended that the juvenile court find the allegations in the petition true based upon the risk presented to E.D. from mother's history of physical abuse and neglect.

On August 11, 2020, the Agency filed a Disposition Report, which recommended that mother be denied reunification services pursuant to section 361.5, subdivision (b)(3) and (7). These bypass provisions were based upon Mother's re-abuse of E.D.'s sibling and denial of reunification services for the sister on July 21, 2020.

Mother was participating in weekly in-person visits since June 18, 2020, and she was observed to be attentive, engaging, and nurturing towards E.D. An Addendum Report was filed by the Agency on September 8, 2020, containing additional statements by Mother blaming the sister for E.D.'s removal.

The matter was eventually continued and set for a contested hearing to take place on October 15, 2020. At the contested jurisdiction and disposition hearing, the social worker testified that mother's supervised visits for one hour per week with E.D. were appropriate. The social worker observed mother lying on the floor, walking around the room, and reading books with E.D. during visits. Mother continued to deny physically abusing the sister, and she claimed any injuries on the sister were due to bicycle accidents.

The juvenile court found that E.D. fell within the provisions of section 300, subdivisions (b) and (j), denied reunification services to Mother pursuant to section 361.5, subdivision (b)(3) and (7), and set a section 366.26 hearing for January 28, 2021. Specifically, the juvenile court reasoned that it could not find that reunification services were in E.D.'s best interests by clear and convincing evidence as Mother was required to prove. The juvenile court also noted that it would be struggling to even find the lower standard of preponderance of the evidence given the evidence before it.

**Section 366.26 Hearing**

The section 366.26 report, filed by the Agency on January 15, 2021, recommended that the juvenile court terminate Mother's parental rights and order a permanent plan of adoption for E.D. The report describes E.D. as having a strong bond with his relative caregivers, who had provided for his needs since being placed directly in their home from the hospital. E.D. looked to his relative caregivers as his parents, and the relative caregivers were committed to a permanent plan of adoption. Mother regularly attended her supervised visitations, which were weekly until the frequency was reduced to monthly at the disposition hearing. No formal visitation agreement had been reached, but the relative caregivers were "open" to facilitating ongoing contact between E.D. and Mother.

After several continuances, the contested section 366.26 hearing was held on June 22, 2021.[2] The juvenile court began with a hearing on mother's section 388 petition, which requested the juvenile court to order reunification services for E.D. Mother offered certificates from courses that she completed for parenting and anger management, and she testified that the classes had changed her parenting style. She stated that E.D. was special because he was her firstborn, and she claimed to be able to provide stability and security for him.

---

[2] The juvenile court denied Mother's request to continue the section 366.26 hearing until an appellate decision regarding the sister's dependency case was issued.

During its ruling on mother's section 388 petition, the juvenile court explained the various burdens of proof that apply depending on the type of request set forth in a section 388 petition. It ultimately found that mother failed to prove, by a preponderance of the evidence, that her requested change was in E.D.'s best interests, and it denied Mother's section 388 petition.

The juvenile court then commenced the contested section 366.26 hearing, which began with testimony from Mother. Mother testified that she never missed a visit with E.D. and recently celebrated E.D.'s first birthday during a visit. At her supervised visitations, Mother played music, sang, and read books to E.D. Mother also reported that E.D. would get excited to see her and called her "mama" at the beginning of visits. There were also electronic visits over Zoom where Mother interacted with E.D. and the relative caregiver about three times per week for 15 to 20 minutes at a time.

Mother testified that she was a "very important person" in E.D.'s life, and she believed E.D. would be harmed by the severance of their relationship because he recognizes, trusts, and loves her. E.D. fell asleep in her arms during a couple of visits, and Mother hugged, kissed, and held him. She observed many of his milestones and encouraged new skills at visits, but she acknowledged that the relative caregiver had to share many of them with her by video.

Mother also claimed that E.D. tried to get away from the visitation supervisor at the end of visits, but the social worker later denied reviewing any notes of such behavior. On cross-examination by minor's counsel, she described her visits with E.D. during the 10 days that he was in the hospital after his birth. While at the hospital, Mother had E.D. in her care for 24 hours prior to his removal.

The social worker testified that she had observed a visit between Mother and E.D., and she had reviewed notes regarding other visits between Mother and E.D. The social worker would not call Mother and E.D.'s relationship "special" because she believed E.D. was an even-tempered child who easily went to her during her first contact with him. The social worker also believed E.D. referred to his relative caregiver as " 'Mommy' " and Mother as " 'Mama.' "

Mother's counsel acknowledged that E.D. was adoptable and argued that the beneficial parent-child relationship exception to adoption applied. During her argument she addressed the juvenile court's need to consider the harm from a permanent severance of the parent-child relationship in relation to the exception. She then emphasized,

> "[T]he Court must assume that upon its ruling that relationship will effectively be terminated for all purposes. [¶] The Court must assume that there will be no continued visitation, there will not be the continued checking in. While that may ultimately end up being the reality, it is not the consideration of this Court."

Counsel for the Agency asserted that Mother had failed to prove that termination of parental rights would be detrimental to E.D., and minor's counsel joined her comments.

At the beginning of its ruling, the juvenile court noted the Agency's burden to prove that the child is likely to be adopted by clear and convincing evidence. It then proceeded to explain that "[o]nce adoptability has been established, the burden shifts to the party claiming that termination would be detrimental to the child to prove one of the exceptions enumerated under Section 366.26, subsection (c)(1)(a) through (e) by a preponderance of the evidence." The juvenile court cited the case of *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 as one of the cases supporting its articulated legal standard. A thorough overview of the appropriate legal analysis for the beneficial parent-child relationship exception was provided before the juvenile court began weighing the evidence.

The juvenile court noted that E.D. was 14 months old and called both Mother and his relative caregiver a parental name such as "mommy." The evidence to support the existence

6.

of a bond between Mother and E.D. was described as being limited to observations of the Mother, which were countered by some of the social worker's testimony.

The juvenile court then paused its discussion of the evidence to explain its role in applying the facts to the law regardless of its personal feelings. It acknowledged that these types of decisions are never easy, even in its 10th year handling dependency proceedings. The juvenile court then described its earlier decisions regarding the denial of Mother's motion to continue and section 388 petition.

Prior to returning to the remainder of its beneficial parent-child exception analysis, the juvenile court noted that there are adoptions that allow continued contact with the biological parents. It discussed the possibility that Mother may continue to have contact with E.D. after the adoption because there was no indication that there was a relative caregiver looking for the first opportunity to end the parent-child relationship. The juvenile court then stated,

> "Mother's counsel points out that the court's presumption should be and must be that that relationship will sever if the court adopts the recommendations, which is to terminate parental rights of the mother and order a permanent plan of adoption for the child. [¶] Even if I operate under that presumption, I'm not correct that that presumption is number one, accurate; and, two is legally irreversible."

The juvenile court returned to its analysis regarding the exception by noting the limited information provided to it that focused on whether a beneficial parent-child relationship existed. The juvenile court continued with the following:

> "The Court does not find that there is sufficient evidence, based on the burden before the Court, upon the shifting of the Court, which is clear and convincing that substantial, positive, emotional attachment would occur. That child has a substantial, positive, emotional attachment to the mother. And that because of the parental rights being terminated, that that would be greatly harmful to the child. There's just not enough information here that suggests that burden has been met and that exception applies."

Mother was complimented on her efforts to have continuous contact with E.D., which made the juvenile court pause to think about the case carefully. The juvenile court believed

7.

the case was not a " 'slam dunk' " for the Agency, but it ultimately found that Mother failed to meet her burden on the exception.  Her failure to meet the burden was based upon the "countervailing testimony and evidence that the child may view [Mother] as a playmate at playdates, because the child is simply too young to understand and comprehend mother-father biology versus contact with people.  Sounds like [E.D.] just loves being around people."

The juvenile court proceeded to terminate Mother's parental rights and order a permanent plan of adoption for E.D.  Mother filed a timely Notice of Appeal on July 27, 2021.

## DISCUSSION

### I.    Application of Legal Standard for Exception to Adoption

Mother contends the juvenile court applied the wrong standard of proof to her claim that the beneficial parent-child relationship exception applied.  She argues any such error was prejudicial because the juvenile court stated that mother made the court "pause" and this was not a "slam dunk" case for the Agency.  Even if Mother is correct that an incorrect standard was applied, we conclude that any such error was harmless.

#### A.    *Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies.  (*In re Melvin A.* (2000) 82

8.

Cal.App.4th 1243, 1252.) "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be greatly harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) While a child may derive enjoyment from "pleasant and cordial … visits" with a parent, that is not the type of benefit contemplated by the statute. (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

**B.** *Standard of Review*

A court abuses its discretion when it applies incorrect legal standards. (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.) "Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.]" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) We review de novo Mother's claim that the juvenile court applied the incorrect standard of proof, as it presents a question of law. (See *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613–614.)

California's Constitution provides, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see Code Civ. Proc., § 475.) Under the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836, reversal is required if "it is reasonably probable that a result more favorable to the appealing party would have been

reached in the absence of the error." (See generally *In re Celine R.* (2003) 31 Cal.4th 45, 60 [*Watson* standard for prejudicial error applies in juvenile dependency matters].)

Numerous cases have analyzed an incorrect application of the clear and convincing evidence standard in place of the preponderance of the evidence standard under the *Watson* standard, and appellate courts have required a showing it was reasonably probable the appellant would have achieved a more favorable result under the proper standard of proof. (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 535; see also *In re Bernadette C.* (1982) 127 Cal.App.3d 618, 625 ["Under the factual setting of this case, we cannot conclude that the error applying the wrong standard of proof was harmless"]; see also *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194 [juvenile court's application of clear and convincing evidence standard to parents' section 388 petitions instead of preponderance of evidence was not harmless because the court of appeal reasoned, "[t]his is not a case where there was no evidence of a change or of the best interests of the minors and the court did not simply misspeak when stating the burden of proof"].)

## C.   *Analysis*

The juvenile court began its ruling with a clear and accurate statement of the appropriate standard of proof on both the issue of adoptability (clear and convincing evidence) and beneficial parent-child relationship exception (preponderance of the evidence). It also appropriately applied a preponderance of the evidence standard to Mother's section 388 petition requesting an order of reunification services, which has been a source of confusion for some juvenile courts. (See *In re L.S., supra*, 230 Cal.App.4th at p. 1194 [juvenile court's failure to apply preponderance of the evidence standard relied on "a flawed, if seductive, analysis in applying a higher burden of proof than the statute requires"].)

However, after a brief digression from its analysis of the exception, the juvenile court stated it was unable to find based on "clear and convincing [evidence] that substantial, positive, emotional attachment would occur. That the child has a substantial, positive, emotional attachment to the mother." It is unclear whether the juvenile court actually

10.

applied a clear and convincing standard through its entire analysis or merely misspoke after conducting two consecutive hearings involving varying standards of proof and issues.

To the extent that a "clear and convincing" burden may have been placed upon mother, it should be noted that it was only referenced in relation to the existence of a "substantial emotional attachment" between E.D. and Mother. The fact that the juvenile court articulated the appropriate standard of proof at the outset of its ruling would suggest that the exception was likely considered under the proper standard. However, it cannot be said with certainty that the juvenile court's analysis was without error given this inconsistency. Even accepting that the juvenile court's application of the standard of proof was in error, we find that any such error was ultimately harmless.

Based on our review of this record, we are not convinced that the court would have ruled differently absent the error because Mother failed to establish the exception under either standard of proof. For Mother to prevail, she needed to show that her relationship with E.D. promoted his well-being to such a degree as to outweigh the well-being he could gain by being placed in an adoptive home.

The juvenile court specifically characterized the evidence in support of the exception as being limited to observations by Mother. And even that evidence was countered by testimony from the social worker. The court was not required to accept Mother's characterization of the strength of their bond or her positive portrayal of her interactions with E.D. during visits. The juvenile court even concluded its analysis by noting the "limited information" that was provided in relation to the exception. The evidence in the record would not have supported a finding that Mother's relationship with E.D. promoted his well-being to such a degree that it outweighed the benefits he would gain in a permanent, adoptive home. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant. [Citation.]")

11.

Mother points out that the juvenile court did not believe the case was a "slam dunk" to argue that the appropriate standard was not applied. However, in context, the court, had previously discussed the difficulty of making decisions to sever the parent-child relationship over the years and concluded mother failed to prove the exception. The juvenile court went on to state that it, "wrestles with this, as a number of times in these instances." It then noted this difficulty of deciding such cases in light of the sincere efforts Mother made to visit the child throughout the case. Such attempts by the juvenile court to lighten the moment and dignify Mother's efforts, while making a decision of the utmost gravity, does not necessarily signify that it was making a complex legal determination.

The fact that Mother's persistent efforts in visitation made the court think carefully merely suggests that there are some "slam dunk" cases it decides that require little deliberation. Such cases likely involve parents who failed to show the first prong of the exception through regular visitation, which would end any serious consideration to apply the exception. Although Mother's presented case may not have been a "slam dunk" for the Agency, it was still not a close call. At the time of the contested section 366.26 hearing, E.D. had spent all but one day of his 14 months with his day-to-day needs being met by his relative caregivers who were committed to a plan of adoption.

Unlike the record before the appellate court in *In re L.S.*, we can conclude that there was no evidence to support the finding of the parent-child relationship exception and it is possible the juvenile court misspoke when articulating the heightened standard. (*In re L.S.*, *supra*, 230 Cal.App.4th at p. 1194.) Given the juvenile court's view of the limited evidence offered by Mother, it cannot be said that it is reasonably probable that a result more favorable to her would have been reached had it clearly applied the correct standard of proof, even under a federal constitutional standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [error "harmless beyond a reasonable doubt"].)

12.

## II.    Consideration of Postadoption Contact

Mother also claims the juvenile court improperly considered the relative caregiver's openness to allow ongoing contact between Mother and E.D. in determining that the exception did not apply.  Mother argues the cases of *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) and *In re C.B.* (2010) 190 Cal.App.4th 102 (*C.B.*) support a proposition that the juvenile court's discussion and possible consideration of the relative caregiver's willingness to facilitate ongoing contact between Mother and E.D. was in error.

### A.    *Legal Principles*

The Legislature has acknowledged postadoption contact agreements and declared that "some adoptive children may benefit from either direct or indirect contact with birth relatives, including the birth parent or parents …, after being adopted."  (Fam. Code, § 8616.5, subd. (a).)  However, the subsequent refusal of an adoptive parent to comply with the agreement does not affect the adoption even where such an agreement has been reached. (See *id.*, subd. (e)(1).)

In the case of *S.B.*, *supra*, 164 Cal.App.4th 296, the juvenile court had found the parent and child had "an emotionally significant relationship."  A bonding study had also been conducted where the clinician opined there was potential harm to S.B. if the parent-child relationship was severed.  (*Id.* at p. 296.)  The Agency's recommendation to terminate parental rights was based in part on a relative caregiver's intent to continue visits between the child and parent.  (*Id.* at p. 295.)

The juvenile court recognized that the child would benefit from continuing her relationship with the parent, but the juvenile court terminated parental rights in part because the child's grandparents would allow her relationship with her biological parent to continue. (*S.B., supra,* 164 Cal.App.4th at p. 300.)  The appellate court determined from the record before it that the "only reasonable inference" was the child would be greatly harmed by the loss of the relationship with her parent.  (*Id.* at pp. 300–301.)  This reasoning was based on the record showing that the child "loved her father, wanted their relationship to continue and

13.

derived some measure of benefit from his visits." (*Ibid.*) Therefore, it concluded that the juvenile court erred when it found the beneficial parent-child relationship exception did not apply. (*Id.* at p. 301.)

The case of *C.B.*, *supra*, 190 Cal.App.4th 126, involved 9-, 10-, and 17-year-old children " 'of an age where they are intellectually and emotionally aware of whom their parents are.' " The juvenile court had implicitly found the existence of a "substantial, positive emotional parent-child attachment despite the lack of day-to-day contact." (*Id.* at p. 126.) However, it stated " '[t]here is no evidence that that [loving] connection [between mother and the children] would be severed if the Court were to terminate parental rights. The Court cannot see that terminating parental rights would "greatly harm" the children …." (*Id.* at p. 127.) Based in part on this belief, the juvenile court ultimately proceeded to terminate parental rights. (*Ibid.*)

The Court of Appeal found that the juvenile court erred by injecting an improper factor into the weighing process and concluded as follows,

> "[I]f a juvenile court determines that a parent has 'maintained regular visitation and contact' (§ 366.26, subd. (c)(1)(B)(i)), that there is a 'substantial, positive emotional attachment' between child and parent benefitting the child [citation], and that the benefit from continuing that parent-child relationship in a tenuous placement 'promotes the well-being of the child to such a degree as to outweigh' the benefit that child would gain from the stability and permanency of adoption [citation], then the parent-child relationship exception is established. In those circumstances, the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation." (*C.B.*, *supra*, 190 Cal.App.4th p. 128.)

## B.    *Standard of Review*

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*In re Caden C.* (2021) 11 Cal.5th 614, 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639–640.) The

juvenile court's decision as to the third element – whether termination of parental rights would be detrimental to the child – is reviewed for an abuse of discretion. (*Id.* at p. 640.) When applying the abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

### C. *Analysis*

First, it cannot be said that the "only reasonable inference" was that E.D. would be greatly harmed by the loss of the relationship with Mother as was the case in *S.B.* The juvenile court here specifically found that mother did not prove the existence of a substantial, positive emotional attachment with E.D. and there was no bonding study presented regarding the strength and nature of the Mother's bond with E.D. Furthermore, the Agency's recommendation was not based on any promise by the relative caregiver to continue visitation. As the juvenile court correctly stated, Mother had provided limited information to support her claim on the exception. Therefore, there are no meaningful similarities to *S.B.* and the present case that would establish an abuse of discretion.

Second, unlike the case of *C.B.*, we do not believe that the juvenile court ordered termination of parental rights on the expectation that there would be ongoing contact between the Mother and E.D. The juvenile court never made an express statement that there would be no severance of the parent-child relationship based on an agreement for postadoption contact. In fact, the social worker's report explicitly mentioned the lack of any formal visitation agreement, and it merely highlighted the relative caregivers being "open" to facilitating visitation between Mother and E.D.

Nothing about the juvenile court's ruling indicated it had found sufficient evidence to support the existence of a beneficial relationship and then declined to apply the exception based on an unenforceable promise of future visitation. The juvenile court's comment regarding possible future contact was made on the heels of other statements highlighting the

15.

difficulty of making decisions to terminate parental rights. From the context of the juvenile court's statements, it appeared to be expressing a positive note that Mother might still be allowed to maintain contact in order to soften the blow of its forthcoming orders. We also find the juvenile court's response to Mother's counsel's statement that it must assume the relationship will be severed to be vague and inconsequential rather than suggesting that it believed potential postadoption contact necessitated a denial of the exception.

The totality of the juvenile court's statements at the hearing makes clear that it decided to terminate Mother's parental rights because she failed to meet her burden of proving the existence of a beneficial parent-child relationship. We do not believe that the juvenile court injected an improper factor into its determination on the exception or gave information on possible postadoption contact any weight in deciding a permanent plan for E.D. Therefore, we find no such error on this record.

**DISPOSITION**

The juvenile court's orders are affirmed.


POOCHIGIAN, ACTING P. J.

WE CONCUR:


DETJEN, J.


SMITH, J.


16.