Filed 5/23/23  In re A.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | |
| | E080078 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super.Ct.No. J279463) |
| v. | **ORDER MODIFYING OPINION** |
| A.J., | [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT

On the court's own motion, our nonpublished opinion filed May 19, 2023, is modified as follows:

In footnotes No. 2 and No. 3, the "as of" date should be May 19, 2023.  The text should read:  [as of May 19, 2023].

This modification does not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                                J.

We concur:

MILLER
                              J.

MENETREZ          J.

1

Filed 5/19/23 In re A.J. CA4/2 (unmodified opinion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.J.,<br><br>        Defendant and Appellant. | E080078<br><br>(Super.Ct.No. J279463)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. David E. Driscoll, Judge. Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant A.J. appeals from an order transferring jurisdiction over him from the juvenile court to a court of criminal justice, pursuant to Welfare and Institutions Code former section 707. (Stats. 2018, ch. 1012, § 1, eff. Jan. 1, 2019.) He contends subsequent legislation applies retroactively and requires reversal so the court can reconsider its ruling in light of the recent ameliorative changes enacted by Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 330, § 1, eff. Jan. 1, 2023.) The People agree that the changes apply retroactively in this case; however, they argue no remand is necessary because, given the evidence presented at the transfer hearing and the court's "extensive and detailed discussion of its reasoning," there is no reasonable probability it would have reached a different result under the amended law. We agree with the People and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. Minor's Criminal Background.

Beginning in 2019, defendant was subject to juvenile probation after sustaining a violation of Penal Code section 601, subdivision (a), trespass by threat, a misdemeanor. He violated his probation and picked up new offenses,[1] including his current offenses, which prompted the filing of a transfer petition to determine whether he should be considered an eligible and suitable subject under juvenile court law.

---

[1] His misdemeanor offenses include vandalism over $400 (Pen. Code, § 584, subd. (b)(1)) on June 24, 2019, and resisting, obstructing, or delaying a peace officer or emergency medical technician (Pen. Code, § 148, subd. (a)(1)) on December 4, 2019.

2

*B. Defendant's Current Offenses.*

On December 29, 2020, four males, including defendant, E.W. (a juvenile), and J.M. (an adult), got into an argument with D.A. in front of an apartment complex. The group left in J.M.'s white sport utility vehicle (SUV) but returned and reengaged the argument with D.A. Defendant pulled out an AR-15 firearm and fired approximately 10 shots at D.A. One bullet went through the side of the apartment complex and struck a 12-year-old girl in the arm.

Defendant's mother's Employment Development Department (EDD) card was found at the scene, along with 12 fired cartridge casings. Police spoke to J.M. (the driver of the SUV and person whom law enforcement initially suspected was the shooter), and he confirmed that defendant drew the AR-15 and fired multiple rounds. Defendant's fingerprints were found on the rear door of the driver's side of the SUV. He fled the scene and was later arrested in Las Vegas while in the possession of a firearm; defendant was extradited to California in February 2021.

*C. Petition and Transfer Motion.*

On March 11, 2021, the San Bernardino County District Attorney filed a wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging that defendant committed attempted murder (Pen. Code, §§ 664, 187, subd. (a)), assault with a firearm (Pen. Code, § 245, subd. (a)(2)), assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), shooting at an inhabited dwelling (Pen. Code, § 246), and possession of a firearm by a minor (Pen. Code, § 29610). The People requested a transfer hearing under Welfare and Institutions Code former section 707.

*D. The Transfer Hearing.*

The transfer hearing was held over several days in July, August, and October 2022.

*1. The prosecution's evidence.*

Officer Flores had supervised defendant during his probation and prepared the transfer report in this case. Defendant was first placed on summary probation in February 2019 for misdemeanor trespass. Although he initially reported to probation, he subsequently committed two separate offenses, one in June for vandalism and the other in December 2019 for throwing rocks at cars, and he failed to complete a component class, provide proof of community service, and test negative for drugs. Defendant was rereferred to classes, but he did not complete them or report to Officer Flores.

In February 2020, Officer Flores filed a probation violation petition, which alleged that defendant failed to attend school, failed to report to his probation officer, smoked marijuana, failed to attend drug and alcohol class, failed to complete his required community service hours, and associated with another probationer in violation of the terms of his probation. She tried to work with him before submitting this petition, but he was not showing any effort or improvement in completing any requirement of probation. He was inconsistent in calling in to check with her. He "had not done any of his classes," even the online ones, or completed any type of alternative community service. After he committed his current offenses, he failed to report to Officer Flores, who was unaware of his whereabouts between December 9, 2020, and February 6, 2021. Thus, she issued a bench warrant, and he was picked up in Las Vegas. In her opinion, defendant's criminal

4

behavior had escalated such that he was no longer a "suitable subject to be dealt with under juvenile hall." She described his progress on probation as "lacking," as if "he was more going through the motions" and not putting "effort into completing anything."

Later in the transfer hearing, Officer Flores explained that defendant was not referred to programs like "Info or Wraparound" because they are aimed at family reunification for juveniles who do not have a good relationship with their families. Here, defendant's family supported him and cooperated with probation; however, Officer Flores noted that they failed to assist him with his classes or community service. The officer acknowledged that she never had an issue with defendant's attitude. Regarding her 2021 report's conclusion that defendant was not suitable for the Department of Juvenile Justice (DJJ), she explained that he will age out when he turns 21, and the ARISE[2] program was not available when she prepared her report. Since the transfer hearing was held one year after her report was prepared, she was given the opportunity "to do some recalculation" and reconsider her initial opinion. After doing so, Officer Flores informed the juvenile court that she still believed defendant was not suitable for juvenile court because of the number of years he has been on probation, and the fact that he will turn 18 in November 2022, giving him less than four years under juvenile court jurisdiction. Regarding the five prongs for a transfer, she had already testified about

_____

[2] ARISE is a San Bernardino County Probation program and stands for "A Restorative Integration for Successful Engagement." The program includes a secure treatment facility for youth who would have previously been committed to the DJJ. (See <https://sanbernardinocountyprobation.org/ locations/arise-program> [as of May 22, 2023].)

5

defendant's rehabilitation in the juvenile court's jurisdiction, the success of those prior attempts to rehabilitate, and defendant's criminal history. Thus, regarding the remaining two prongs, Officer Flores opined that defendant exhibited a degree of criminal sophistication given the circumstances of the shooting, his evading arrest by fleeing to Nevada, his changing his story to police officers, and his failure to admit to committing the offense. As for the gravity of the offense, she emphasized defendant "going back to his home, having time to think, shooting multiple rounds at the apartment complex," and his absconding from probation and evading arrest in another state.

On cross-examination, Officer Flores agreed that the ARISE program has taken over for DJJ, that it houses minors who are facing Welfare and Institutions Code section 707, subdivision (b) offenses, is a secure facility, and offers various programs including "ART and Forward Thinking," both of which defendant has completed. Regarding defendant's recent performance, she testified that it was "hit or miss," meaning that "some weeks, he'll be doing good, and some weeks he'll be not doing so hot." She added that he has been in "seven 1088s and 11 code reds." "[T]here has been . . . 1088 code reds that he's been involved in where it was either a mutual fight or he was listed as an aggressor." Although defendant has had some recent success in his progress toward rehabilitation, Officer Flores opined that he is "still having issues following the rules of the system and whatnot. So [she did not] know if [she] would say that he has within a year and a half . . . shown progress towards rehabilitation if he's still having issues to this day."

6

Probation Officer Kim testified about the screening process to determine a juvenile offender's suitability for ARISE. There are five categories: severity of the circumstances of the crime, past criminal history, family dynamic, treatment options at the community base level, along with past responses to community-based options, and developmental, physical, and educational needs. Officer Kim, and her supervisor, conducted an evaluation of defendant. They determined that he played a "very, very severe and active role within the crime that was committed," he "armed himself with the firearm, went back to his home to get the firearm, and then confronted the [targeted victim] . . . pull[ing] out the firearm and basically [shooting] several rounds towards [him]." Also, she noted that defendant fled and evaded law enforcement while he was on probation, and went to Nevada where he provided a false name to police officers who stopped him and found a firearm in his possession.

Officer Kim testified that they considered defendant's prior performance on probation, finding that "there was zero deterrence, zero effort from [him] to be successful." She explained that in the ARISE program, minors "have to participate in treatment, education and programming, and with his records, he has shown that he will not participate." Also, an important part of ARISE is family reunification and family services; however, the criminal history of minor's family shows "that they are not responsible adults or responsible parents in the youth's life, and therefore, . . . they wouldn't participate in the program." On cross-examination, Officer Kim was presented with defendant's most recent detention summary that showed improved behavior, his having obtained a unit job—which is a privilege—his completion of the "HIT program,"

7

his high point scores while in custody in 2021 and 2022, his enrollment in the "ART program" and parenting classes, and his visitation with his son. Despite this information, she would not change her opinion regarding his suitability for the ARISE program. On redirect, Officer Kim pointed out various code reds and other 1088s that defendant was involved in during the same recent period,

2. *The defense evidence.*

Defendant's mother testified that defendant suffered from depression and mood swings due to recent deaths in the family. She opined that he has the appropriate family support to succeed in the juvenile system. However, when questioned about his underwhelming performance while on probation, she attributed it to her ignorance of the classes he was supposed to take and COVID, which prevented him from completing his community service requirements. She admitted that she had known where defendant was staying after committing his current offenses, but she did not tell police because she was hiring a lawyer to bring him to the police station. Defendant's mother admitted that her husband (defendant's stepfather), has a criminal record including robbery, possession of a firearm, and shooting at an inhabited dwelling, and is currently incarcerated.

A private investigator with a background in law enforcement interviewed defendant's mother and witnesses to defendant's current offenses, and reviewed the police report, Dr. Marjorie Howard-Graham's report, the probation officer's report, and defendant's criminal history. He opined that defendant's criminal background is not extensive because his crimes are minor, typical juvenile delinquency misdemeanors.

Dr. Howard-Graham, a clinical psychologist, reviewed various documents (police reports, the initial detention report from probation, and the probable cause statement), interviewed and evaluated defendant, and wrote a report detailing her findings. She diagnosed defendant with major depressive disorder recurrent, moderate type; anxiety disorder; and borderline intellectual functioning. She assessed him as having a low moderate risk of reoffending based on a comparison of his poor performance in complying with the terms of his probation, his reoffending, and his association with other delinquents, with his resilience and strong attachments and bonds to his mother and family members.

Dr. Howard-Graham offered her opinion on each of the five prongs for a transfer. Regarding the first prong (degree of criminal sophistication), she did not consider him to be criminally sophisticated because "his decision-making and his capacity to problem solve and think things through and make good decisions are not at a sophisticated level." Regarding the second prong (rehabilitation in the juvenile court's jurisdiction), she found sufficient time remained in the juvenile court's jurisdiction for his rehabilitation because the ARISE program can meet his needs. Regarding the third prong (criminal history), Dr. Howard-Graham acknowledged defendant's reoffending but stated: "[T]aking the totality of what he's done and how he's functioned in juvenile hall, I think it's premature to say he's established a pattern of criminal activity that's going to persist." Regarding the fourth prong (success of prior attempts to rehabilitate), she again noted that defendant's reoffending is a concern, along with his poor probation performance; however, she found that the probation department did not have enough information about

9

defendant's mental health and cognitive impairment/borderline functioning intelligence quotient (IQ) issues to address them. Regarding the fifth prong (gravity of his current offenses), she opined that he was not the leader type given his lack of capacity to plan out a sophisticated offense, depression, anxiety, and lower IQ. Thus, Dr. Howard-Graham recommended that defendant stay in the DJJ.

On cross-examination, Dr. Howard-Graham acknowledged that she had not reviewed any of defendant's prior probation reports or school records. She met with defendant one time for three and a half to four hours. She failed to interview any family members, the investigating detective, defendant's probation officer, or school officials. She did not rely on any other doctor's reports, but admitted that if "further contradictory information were to arise, [her] opinion might change." She testified that she did not want to "assume, based on the evidence, that the [defendant] was, in fact, the shooter," because "that's beyond [her] scope."

On further cross-examination, Dr. Howard-Graham was asked whether her opinions regarding each of the five prongs would change if she assumed that defendant was the shooter, he was with three coparticipants, and he hid for approximately two months before being arrested in Las Vegas for being in a vehicle with a firearm. She replied, "If it turns out that [defendant] was the shooter, then that does elevate the offense to being sophisticated," but whether he is criminally sophisticated depends on whether he was the one directing the actions of all the participants. Regarding the second prong, she stated that whether defendant may be rehabilitated in the DJJ is "really just based on his age." Regarding the third prong, she agreed that there was an escalation from the first

10

three misdemeanors to the assault with a firearm. Regarding the fourth prong, she agreed that if the probation officer informed her that defendant repeatedly failed to complete the terms of his probation, then prior attempts to rehabilitate were not successful. Regarding the fifth prong, assuming that defendant was the shooter, Dr. Howard-Graham acknowledged that there would only be aggravating factors but maintained they would be weighed against defendant's depression, anxiety, and lower IQ.

An independent social worker prepared a report after reviewing the police reports, the mental health report, another psychological report, defendant's IEP, and speaking with both the defendant (about an hour and a half) and his mother (about an hour). She noted that defendant's mother moved about seven times since his birth to "have a better life" and escape "domestic situations." Defendant did not have "much of a relationship with his [biological] father until about five years . . . prior to [her] report." In elementary school defendant received A's and B's, in middle school he had B's, C's, and D's and, in high school, his grades dropped dramatically. Defendant told the social worker that recent deaths in his family had impacted his behavior, causing his depression and anxiety. He explained that some of his recent decisions were impulsive and not necessarily right. The social worker described defendant's mother as supportive. On cross-examination, the social worker acknowledged that she did not verify defendant's school attendance, review his probation report, or interview any witnesses, investigating officers, or probation officers.

11

*D. Transfer Hearing Ruling.*

After considering all the evidence—exhibits and testimony—and independently weighing the five factors set forth in section 707, subdivision (a)(2)(A)-(E), the juvenile court concluded the "matter should be transferred to the court of adult criminal jurisdiction" and ordered defendant transferred to the jurisdiction of the adult criminal court. We detail the juvenile court's analysis in our discussion below.

## II. DISCUSSION

*A. Welfare and Institutions Code former Section 707 and Retroactivity.*

At the time of defendant's transfer hearing, the governing law and the corresponding California Rules of Court required a petitioner to establish by a preponderance of the evidence "the minor should be transferred to a court of criminal jurisdiction." (Welf. & Inst. Code, former § 707, subd. (a)(3); Cal. Rules of Court, rule 5.770(a).)[3] Effective January 1, 2023, Assembly Bill No. 2361 raised that burden of proof to the clear and convincing evidence standard, and added the requirement that the juvenile court's explanation for any decision to transfer "include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).)

Generally, ameliorative criminal legislation applies to all nonfinal judgments. (See *In re Estrada* (1965) 63 Cal.2d 740, 748.) In *People v. Superior Court* (*Lara*)

---

[3] As of the filing of this opinion, the Judicial Council has not revised California Rules of Court, rule 5.770(a) to conform to the amended section 707. (See <https://www.courts.ca.gov/cms/rules/index.cfm?title=five&linkid=rule5_770> [as of May 22, 2023].)

(2018) 4 Cal.5th 299, 303, the California Supreme Court considered whether this general principle applied to Proposition 57, the Public Safety and Rehabilitation Act of 2016, which prohibited prosecutors from charging juveniles with crimes directly in adult court and placed the burden of proof on prosecutors at transfer hearings. Noting that "*Estrada* is not directly on point," the court nonetheless found that its rationale applies. (*Lara*, at p. 303.) The court reasoned that "[t]he possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment," and concluded, "[f]or this reason, *Estrada's* inference of retroactivity applies." (*Ibid*.)

Similar to Proposition 57, Assembly Bill No. 2361 raises the burden of proof for transferring a juvenile to adult criminal court and reduces the possible punishment for juveniles. (*Lara*, *supra*, 4 Cal.5th at p. 303.) Thus, the parties agree, as do we, that applying *Lara's* reasoning to Assembly Bill No. 2361, defendant is entitled to its ameliorative benefits.

*B. Analysis.*

In deciding whether a minor should be transferred to a court of criminal jurisdiction, the juvenile court is required to consider five criteria: (1) "[t]he degree of criminal sophistication exhibited by the minor" (Welf. & Inst. Code, § 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id*. at subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (*id*. at subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id*. at subd. (a)(3)(D)(i)); and (5) "[t]he

13

circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id*. at subd. (a)(3)(E)(i)). Applying these factors, the juvenile court makes a factual finding of whether the People have demonstrated that "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id*., subd. (a)(3).)

Effective January 1, 2023, this factual finding must be made "by clear and convincing evidence." (Welf. & Inst. Code, § 707, subd. (a)(3).) Here, the juvenile court's finding was made under the former preponderance of the evidence standard. "The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998; see Evid. Code, § 115.) "'Clear and convincing' evidence requires a finding of high probability." (*In re Angelia P*. (1981) 28 Cal.3d 908, 919, superseded by statute on another issue as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229-230; accord CACI No. 201.) Courts have also described the standard "as requiring that the evidence be "'so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind.""" (*In re Angelia P*., at p. 919.)

Because the statutory requirement that the juvenile court apply the clear and convincing standard to the transfer motion under Welfare and Institutions Code section 707 does not implicate defendant's constitutional rights, we apply the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*), in determining whether the application of the lesser burden of proof than currently required amounted to harmless

14

error.  (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 195 ["We evaluate nonstructural state law error under the harmlessness standard set forth in *Watson* . . . ."]; *Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 533 [in a different context, applying *Watson* to erroneous use of the preponderance of the evidence standard instead of clear and convincing evidence, where the higher standard was required by state law].) Thus, we consider whether the juvenile court would make the same decision, based on the same evidence, but under the higher standard of proof required by Assembly Bill No. 2361.

Applying *Watson*, we do not find it reasonably probable that the juvenile court would have reached a different decision under the clear and convincing standard of proof. The court's detailed discussion of its reasoning acknowledged that one factor weighed in defendant's favor; there is sufficient time to rehabilitate defendant in the DJJ.[4]  (See Welf. & Inst. Code, § 707, subd. (a)(3)(B).)  Nevertheless, the court also found that other evidence weighed heavily against a finding that defendant was amenable to rehabilitation under the jurisdiction of the juvenile court.

---

[4] The juvenile court compared the maximum adult sentence for defendant's offenses to the baseline terms for "Gateway/ARISE," considered Dr. Graham-Howard's opinion, Officer Kim's testimony, and Officer Flores' report, and concluded that since defendant "appears to have at least four years baseline term or seven years to reach the age of 25, during which time the juvenile justice system would retain jurisdiction, the probative evidence presented on this issue does not rule out the potential that the youth could be rehabilitated.  Therefore, under this criterion, the youth is considered to be a suitable subject to be dealt with under juvenile court law."

The circumstances of the offenses suggest that defendant had "a high degree of criminal sophistication." As the juvenile court noted, defendant retrieved an AR-15 from his apartment, concealed it inside his pants, returned to the location where he and his friends had exchanged words with D.A., confronted D.A. with the firearm in hand, fired at D.A. as he walked away, got back in the vehicle and continued shooting from the rear passenger driver side as it traveled on the street.[5] When interviewed by police, defendant

_____

[5] "The Court has determined that probative evidence establishes the following: The underlying shooting incident occurred during the late afternoon hours of December 29, 2020. [Defendant] resided with his mother . . . , stepfather . . . , siblings and cousins in Apartment Number 4. His neighbor [J.M.], who resided in Apartment Number 5, . . . drove [defendant], his friend [E.W.], and another unknown youth to the Barstow liquor store. [J.M.] was driving a Ford Edge SUV. They intended to purchase marijuana from the weed man, who was a pedestrian in the vicinity of the Barstow liquor store. The youths encountered at least two pedestrian individuals. And there was an argument outside of the SUV, with one side making accusations that the other side had stolen their dirt bike. The youths got back into the SUV, and [J.M.] drove away, with each side yelling at each other. [J.M.] drove to his apartment building, at which time [E.W.] allegedly discovered that his cell phone was missing, and he may have dropped it in the street during the altercation.

"[Defendant] retrieved an AR-15 from his apartment. The firearm was also later described by [defendant] as an AR pistol, while denying he was the shooter when interviewed by an investigating officer. [Defendant] placed the firearm inside his pants and covered the top handle portion with his shirt, according to [J.M.]'s statement.

"[J.M.] drove the youths to the 500 block of Fredricks Street, where they encountered [D.A.], about whom they had exchanged words earlier. Heated words were again exchanged, and there were accusations that [E.W.]'s cell phone was stolen. [Defendant] was seated in the backseat, behind the driver, [J.M.]. [Defendant] exited the vehicle, pulled the firearm out of his pants, and confronted [D.A.] According to the investigative police reports, two witnesses . . . stated they had observed the shooter pull the AR weapon out of his pants. [D.A.] may have been holding a BB gun in his hand or clutching his pants as if he had a firearm.

"[D.A.] retreated, and witnesses observed [him] walking away from [defendant] toward the driveway to the garage structure servicing the apartment residences. [Defendant] fired at [D.A.] and got back into the vehicle and continued shooting from the rear passenger driver side of the vehicle as it traveled east on Fredericks. [D.A.] and the apartment residences were on the north side of Fredericks in the direct line of fire."

16

initially denied any knowledge about the attempted murder of D.A.; however, once officers stated that the evidence placed him at the scene, defendant first identified his adult friend, J.M., as the shooter, then claimed it was a juvenile friend who was sitting in the back seat of the vehicle.[6] The court further pointed out that defendant lied about his involvement in the shooting when he was evaluated by Dr. Graham-Howard.[7]

Given the physical evidence, the juvenile court stated: "It is well within the realm of reasonable inferences that [defendant's mother's] EDD card fell onto the street from [defendant's] clothing when he pulled the AR weapon from under his shirt and out of his pants, while standing in the street outside the vehicle before commencing shooting. Also, [defendant's] fingerprints were found on the outside of the rear driver's door, passenger side. [Defendant's] attempt to cover up the crime by denying involvement to

---

[6] The juvenile court stated: "During [defendant's] interview with the investigating officers, he initially stated he did not know anything about the attempted murder that occurred in Barstow. However, once the officers made [defendant] aware that his mother's Employment Development Department card was located on the scene, the youth changed his statement and admitted he was present at the time of the shooting, but denied he was the shooter. [¶] [Defendant] then placed the blame on his adult friend [J.M.] and stated he was the one that was doing the shooting. However, when the officers informed [defendant] there was gunshot residue found in the backseat of the vehicle, he changed his statement again and placed the gun in his friend Tay's hands. [Defendant] was less than truthful throughout his interview with the investigating officers."

[7] "[Defendant] was subsequently evaluated by Dr. Graham-Howard, who was retained by his attorney. He denied retrieving a firearm, denied possessing a firearm, and denied he was the shooter. He told Dr. Graham-Howard that he did not know the intentions of the other individuals in his group, and that he was simply in the wrong place at the wrong time. [¶] However, [J.M.] identified [defendant] as the shooter and confirmed [he] was in the rear seat on the passenger driver's side. Additionally, the investigating officers found [defendant's] mother's Employment Development Department card in the street at the location where the trail of empty cartridges started, as evidenced by the testimony of the Detective Helms and the diagram of SCS technician."

17

investigating officers and Dr. Graham-Howard manifests an aptitude for criminal sophistication. [Defendant's] actions of retrieving and concealing the firearm in his pants evidences planning and criminal sophistication. Additionally, the subject firearm has been characterized as an AR pistol, which the Court construes to be an advanced and/or modified weapon. Familiarity with and use of such weaponry is indicative of a degree of criminal sophistication. [Defendant's] attempts to cover up the crime are also an indicia of a high degree of criminal sophistication.

"The youth appreciated the consequences of his criminal acts, which is exhibited by the fact that he endeavored to avoid detection. He was instructed to turn himself in to the police by his private attorney, and he told his attorney that he would comply. Instead, he absconded to Las Vegas. The cover-up and attempt to avoid detection continued when he was picked up at a traffic stop in Las Vegas, while there was a warrant for his arrest.

"The police investigation reports establish that he attempted to mislead the officer as to his true identity. He was also concealing a firearm while he was speaking with the officer, i.e., he was sitting on a handgun in the vehicle. A search of his Las Vegas motel room revealed a loaded Glock 27, .40-caliber, with an extended magazine. A 50-round drum magazine, and an additional .40-caliber magazine. Jay Welch was also present. This is more evidence of [defendant's] criminal sophistication at the time of the subject offenses.

"Dr. Graham-Howard has opined that [defendant's] clinical interview and psychological testing rule out modifying psychological stressors and an adjustment disorder in [defendant's] case. Dr. Graham-Howard diagnosed major depressive and

18

generalized anxiety disorders, with borderline intellectual functioning. She stated that the youth endorsed experiencing anxiety over the future. According to Dr. Graham-Howard, the major contributor to [defendant's] depression is a feeling of inferiority to his peers, instances of bullying, and a feeling of dissatisfaction with his inability to make friends.

"As to cognitive functioning, Dr. Graham-Howard places the youth at a borderline range of intelligence. His functioning range falls between mild intellectual deficit and low average. But is not severe enough to meet the criteria for intellectual disability. She testified that [defendant's] 3rd to 5th grade level of cognitive skills affects his judgment and reasoning. Dr. Graham-Howard observed and opined in the report that the youth's abstract reasoning skills were fair, and he demonstrated fair judgment when he asked what he would do with a series of hypothetical situations. Dr. Graham-Howard concludes that [defendant's] low range of cognitive skills would lead to her assessment that the minor is not criminally sophisticated.

"With regard to the level of criminal sophistication evidenced by the commission of the underlying crime, Dr. Graham-Howard states it is unclear how much of that sophistication can be attached to [defendant]. This is based in part upon her assumption that [defendant] was not the shooter and did not play a major role in the criminal offense.

"The Court finds no probative evidence of any significant familial, adult, or peer pressure effect on the youth's actions, or significant effect of the youth's family, community environment, and childhood trauma on the youth's criminal sophistication. [defendant] denied any history of traumatic childhood events, including verbal,

19

emotional, or physical abuse by anyone outside or inside the family. And Dr. Graham-Howard did not allude to any such stressors or indicators as significant in her evaluation.

"There's no probative evidence that [defendant] was succumbing to peer pressure or manipulation when committing the criminal offense, or that he was trying to gain favor with his peer group. In fact, when confronted by investigating officers with his involvement in the crime, he attempted to point the finger of blame at other members of the group, which is contrary to any desire to ingratiate himself to his peers. In this instance, peer pressure or manipulation, if any, had no impact on the criminal sophistication exhibited by the minor. Therefore, under this criterion, the youth is not considered a suitable subject to be dealt with under juvenile court law."

According to the evidence, defendant's previous delinquent history is extensive and serious given its short period. The juvenile court summarized defendant's prior offenses and performance on probation, and the opinions of Dr. Graham-Howard, the defense investigator, and Officer Flores.[8] The court explained: "[T]he escalation of

---

[8] "As to criterion number three, the youth's previous delinquent history, Court finds on February 27th, 2019, the youth, [defendant], was granted summary probation pursuant to Welfare and Institution Code Section 725(a) following the sustained allegation of Penal Codes 601(a) trespass by threat, a misdemeanor. On January 18th, 2019, it was reported to the Barstow police department that a student received messages on the Instagram social media site from three subjects that they were going kill him. While reviewing the messages, the officer heard a voice recording of [defendant's] co-participate saying, 'Nobody throwing fades, we throwing bullets. And [defendant] will beat you up and shoot you.' A video message [defendant] showed four semi-automatic handguns, which his parents later claimed to be BB guns. Ostensibly, the intent of the recording and video was to instill fear of being killed in the victim.

"On June 24th, 2019, [defendant's] summary probation grant was terminated and he was declared a ward of the court following a subsequent sustained allegation of Penal

*[footnote continued on next page]*

20

criminal activity, which includes elements of threats with the appearance of firearms, resisting police officer by attempting escape apprehension, and multiple violations of probation, all of which resulted in extended periods of time in custody, renders a finding by this Court that the youth is not considered to be a suitable subject to be dealt with under the criterion—under this particular criterion in juvenile court law.”

Next, the DJJ's attempts to rehabilitate defendant have not been successful. The juvenile court pointed to defendant's failure to comply with his probation officer's

---

Code Section 594(b)(1), vandalism over $400, a misdemeanor, and he was ordered to serve 30 days in custody. On June 5, 2019, Barstow police officers responded to a report of a patrol unit being vandalized by four juveniles. It was discovered that [defendant] and his coparticipants jumped on the hood, roof, and windshield of the vehicle, causing extensive damage.

"On December 4, 2019, [defendant] was continued a ward of the court, following a subsequent sustained allegation of Penal Code 148(a)(1), resisting, obstructing, or delaying a peace officer, which is a misdemeanor, and was ordered to serve 21 days in custody.

"On November 13, 2019, an officer was dispatched to the block of Barstow Road in reference to rocks being thrown at four victims. The suspects were throwing rocks on the roadway at passing vehicles. When the officer approached the suspects, they all began to run into the desert area and did not listen when the officer gave them directives to stop.

"On March 4, 2020, [defendant] was again continued as a ward of the Court, following the probation violation. And he served 38 days in court—in custody. I'm sorry. [Defendant] failed to report to the probation office as directed multiple times.

"Dr. Graham-Howard reviewed [defendant's] probation records and the youth's history of contacts with law enforcement. According to her review of the records, Dr. Graham-Howard opines at page four of her report [defendant] has done poorly on probation with multiple violations and quote, escalation of criminal activity over time, end quote.

"The youth's retained investigator, who has out-of-state employment experience as a parole and corrections officer, was of the opinion that the youth's criminal history was not serious. The youth's probation officer . . . testified that [defendant's] offenses, both criminal and for probation violations, have been escalating and that the level of criminal behavior has increased over the years."

21

directives or complete various classes and community service hours despite multiple referrals.**9** Reviewing his juvenile detention and assessment center behavior summaries, the court noted that from January 2019 through March 2020, "[defendant] was placed in custody in juvenile hall for a total of 89 days during that time period. During which, while in custody, he attended and participated in unit rehabilitative programs and received good behavior points. However, despite his good conduct record while in custody, he thereafter continued to commit new offenses and multiple probation violations after release.

"[F]rom March 2021, following his arrest for attempted murder, to the present, [defendant's] school attendance has been excellent for the most part. He has exhibited positive school behavior and good academic work habits. Additionally, he has participated in all unit programs such as ARISE life skills, forward thinking, et cetera.

"However, [defendant's] attitude towards detention center staff and peer interaction have vacillated between good and poor. He has been a high pointer on occasion, and it was noted on one or two instances that he was quite helpful to the staff and took leadership role by counseling a youth. However, there have been a greater

---

**9** "The Court finds [defendant] has not completed a component class since placed on probation February 27th, 2019. The youth was referred to drug and alcohol class two separate times, but failed to successfully complete the class. Additionally, [defendant] was referred to a victim awareness class two separate times. However, he failed to successfully complete the class. The youth failed to complete any of his required community service hours. [Defendant] has referred to—[defendant] was referred to multiple and a multitude of programs during his probation. And has failed to comply with his probation officer's directives. [Defendant] was actively on probation for past offenses when he allegedly committed the present offenses of attempted murder."

number of occasions where the youth was disrespectful to the staff and refused to follow directives. It was reported on multiple occasions that the youth used foul language towards the staff such as shut the eff up effing bitch, and flipping off the staff, while refusing to follow directives."

Defendant's attitude and behavior did not approve in 2022. As the juvenile court stated: "As recent as July, 2022, it was reported that the youth was not following directives, called staff foul names, and stated he doesn't give an eff about his dollars. There have also been months in 2022, wherein the youth has been involved in code red physical altercations. He was most recently involved in two code reds in July 2022. The first incident involved [defendant] striking another youth in the face with a closed fist. The second incident involved a mutual physical altercation. [Defendant's] misconduct has persisted, despite the fact he has been in custody in excess of 500 days. And despite the fact that he has been attending all unit rehabilitations, including ARISE, while in custody."

The juvenile court acknowledged Dr. Graham-Howard's testimony that the DJJ programs are similar to those offered by ARISE, and a youth's performance while attending those programs is a good indicator as to how he or she will do in placement with ARISE. However, the court noted her evaluation of defendant was conducted in early March 2021, and "there was no testimony by Dr. Graham-Howard to the effect that she actually reviewed the youth's detention behavior summary reports at any point from March 2021, up to the present." Because no "basis was offered for the opinion regarding the youth's performance in juvenile detention, [the court concluded that], under this

23

criterion, the youth is not considered to be suitable for a subject to be dealt with under juvenile court law."

Finally, the gravity of the offense also weighs against retaining defendant in the DJJ. After summarizing the circumstances of the shooting "in a residential neighborhood, during daylight hours, when residents and visitors were likely to be involved in activities both inside and outside of the residences," the juvenile court noted that "[a]t least 13 rounds were fired" at residential frontages and yards, and defendant shot from outside and inside the vehicle at D.A., who was retreating. The court pointed out that "[t]wo residential structures were hit by the gunfire. Bullets struck the front bedroom window area of 545 W. Fredericks Street. Four children, ages 7 to 10 were inside the residence, with three of the children in the front bedroom. Bullets also struck the front of 547 W. Fredricks, where two children ages 12 and 1 were watching TV on their parent's bed. A bullet pierced the headboard and struck the 12-year-old girl in the arm. There was profuse bleeding, requiring immediate transport to the hospital. She was crying and exclaimed to her stepfather that she did not want to die." The court described the offense as "heinous," exhibiting "a callous indifference to human life."

Regarding defendant, the juvenile court observed: "The youth presents a definite risk to the safety of the community. The shooting was not impulsive. The youth went home, retrieved the assault weapon, and concealed it on his person before returning to the scene. D.A. was walking away from the youth when the youth started firing. The youth chose to pull his weapon and shoot at D.A., rather than getting back into the vehicle and leaving the scene.

"There have been no genuine expressions of remorse or sympathy by the youth for the victims. [Defendant] has not accepted any degree of accountability or responsibility for the incident. He initially denied that he was present at the time of the shooting. After being confronted with contrary evidence, he then admitted he was present, but stated that other members of the group were the shooters. He denied having a firearm at the scene and told his psychological evaluator that he was simply in the wrong place at the wrong time and had no idea what was about to occur.

"He also demonstrated an unwillingness to accept responsibility for his actions when he endeavored to avoid detection and not surrender himself when given the opportunity. Instead, he absconded to Las Vegas for approximately one month, where he was apparently poised to continue with criminal activities. He was arrested in Las Vegas while concealing a firearm. And there was an additional firearm and extended magazines located in his motel room with Jay Welch. He also attempted to hide his true identity from the arresting officer in Las Vegas."

After weighing all the relevant factors and considering the totality of the circumstances, the juvenile court found "this matter should be transferred to the court of adult criminal jurisdiction."

In short, the juvenile court's extensive and detailed discussion of its reasoning acknowledged that only one criterion weighed in defendant's favor: that there may be sufficient time left to rehabilitate him in the DJJ. (Welf. & Inst. Code, § 707, subd. (a)(3)(B).) However, the court found the other criteria weighed heavily against finding he was amenable to rehabilitation under the jurisdiction of the juvenile court.

25

(*Id*. at subd. (a)(3)(A), (C)-(E).)  Given the court's reasoning, we do not find it reasonably likely that its decision would have been any different had it applied the clear and convincing evidence standard required by current law.  Nothing in the court's statement of reasons suggests that it found this decision to be a close call, either in terms of determining the facts or weighing the applicable factors against one another, such that application of the heightened standard of review might have made a difference.  Accordingly, defendant has failed to demonstrate that remand would be appropriate.

## III. DISPOSITION

The juvenile court's order granting the transfer motion is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

MENETREZ
J.

26