Filed 10/11/24  In re M.R. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br> S.R., <br><br> Defendant and Appellant. | A170094 <br><br> (Humboldt County Super. Ct. No. JV2200085) |

The Humboldt County Department of Health and Human Services (Department) removed M.R. from the care of S.R. (Mother) based on Mother's mental health problems and substance abuse.  After 12 months of unsuccessful reunification services, the juvenile court set a hearing to choose a permanent plan (Welf. & Inst. Code § 366.26).[1]  At the time, the Department recommended guardianship by M.R.'s maternal grandfather, and Mother did not challenge the order setting a section 366.26 hearing.  Before the hearing, however, the Department changed its recommendation to adoption by M.R.'s foster parents and termination of Mother's parental

---

[1] All undesignated citations are to the Welfare and Institutions Code.

1

rights. Mother then filed a petition claiming that changed circumstances warranted a resumption of reunification services (§ 388). The court denied the petition, finding no "clear and convincing evidence" of a substantial change; terminated Mother's rights; and ordered M.R. placed for adoption.

Mother contends the juvenile court abused its discretion in finding no changed circumstances, primarily because it erroneously applied a "clear and convincing evidence" standard instead of the applicable preponderance of the evidence standard. The Department concedes the error but contends it was harmless. Mother also contends the court erred in finding that the Department fulfilled its duty to inquire into whether M.R. is an "Indian child"[2] under California law implementing the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). (See Welf. & Inst. Code, §§ 224–224.6 (Cal-ICWA).) We conclude that the ICWA inquiry was inadequate and that our Supreme Court's recent decision in *Dezi C.*, *supra*, 16 Cal.5th 1112 compels us, at a minimum, to conditionally reverse the order terminating parental rights and remand for the Department to make and document an adequate inquiry, and for the court to determine, in light of that inquiry, whether ICWA applies. (*Dezi C.*, at p. 1137.) We further conclude that the interests of justice dictate that we conditionally reverse the order denying Mother's section 388 petition and direct the juvenile court, on remand, to reassess that petition using the correct standard of proof in light of current circumstances.

---

[2] Both federal and state law use the term "Indian." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).) Without intending any disrespect, we use that term to reflect the statutory language. (*Ibid.*)

## FACTUAL AND PROCEDURAL HISTORY

### 1. Initiation of the Case and Initial ICWA Inquiry

In May 2022, Mother was placed on a section 5150 hold after she called 911 threatening to kill a person, and responding officers found her in a manic state, insisting her house was bugged. Mother had a history of child welfare referrals based on her mental health that had involved M.R.'s older half sister Jane Doe[3] and, in 2016, M.R. A social worker responding to the current incident found the home shared by Mother and M.R. to be extremely unsanitary and chaotic.

The Department took protective custody of M.R. and filed a dependency petition. It alleged that Mother's untreated mental health and substance abuse issues left her unable to care for M.R. (§ 300, subd. (b)) and that he had been left without support when Mother was detained under section 5150 (§ 300, subd. (g)). The petition listed M.G. as the alleged father. In the detention report, the Department stated it was trying to contact M.G. and attached a copy of a 2013 Solano County judgment adjudicating M.G. to be a parent of M.R. and ordering him to pay child support (Fam. Code, § 17430) ("family support judgment").

The petition stated an initial ICWA inquiry had been completed via CMS (the California Department of Social Services (CDSS) Case Management System), which had given the Department "reason to believe" M.R. is or may be an Indian child. The detention report noted that CMS showed possible Cherokee ancestry; that the Department was sending a

---

[3] To avoid confusion while preserving the confidentiality of M.R.'s half sister, who has the same initials, we refer to her as "Jane Doe."

notice to the three federally recognized Cherokee tribes;[4] and that an e-mail to the Cherokee Nation had yielded a response that Mother and M.R. were not registered, but the Nation needed information about M.R.'s birth father to determine M.R.'s status. The Department stated it had sent the information and was awaiting a reply.

In May 2022, the juvenile court ordered M.R. detained and placed in foster care and set the matter for a contested jurisdiction hearing.

The Department's subsequent jurisdiction report recounted communications with Mother and with M.R.'s maternal grandmother (Grandmother). Grandmother explained that, because of Mother's volatility, M.R. had recently stayed with her for a month and a half in Sacramento County. Grandmother was willing to care for M.R. and was seeking an appropriate place to live. Mother said that, until she could find a safe place to live, she wanted either her sister, Grandmother, or Jane Doe to care for M.R. Mother explained that her neighbors entered her home at night to steal things and inject her with drugs, and her landlord would not help her secure the home. With regard to ICWA, the jurisdiction report noted that the Cherokee Nation had stated M.R. was not an Indian child, but the other tribes had not yet replied.

At the June 2022 jurisdiction hearing, the juvenile court found M.R. subject to its jurisdiction (§ 300, subds. (b) & (g)) and set a disposition hearing. The department sent ICWA notices of the disposition hearing to the three Cherokee tribes, the Bureau of Indian Affairs (BIA), and the Department of the Interior. At the July 2022 disposition hearing, the court

---

[4] The Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians in Oklahoma, and the Cherokee Nation of Oklahoma. (See *In re K.T.* (2022) 76 Cal.App.5th 732, 738.)

relieved counsel for the alleged father M.G., as she had been unable to contact M.G., and found ICWA did not apply. The court declared M.R. a dependent, removed him from Mother's custody, and ordered reunification services for Mother.

### 2. Review Hearings and Termination of Reunification Services

In its January 2023 report for the six-month review hearing, the Department stated M.R. was doing well in his placement; Mother had represented she was seeing a psychiatrist but provided no contact information. Mother had declined to work with a substance abuse counselor and "fired" a therapist. Mother stated she wanted to reunify with M.R. but was not ready to resume custody. At the hearing, the court noted that it had previously found ICWA inapplicable and that the Department's report had provided no new information.[5] The court ordered further reunification services and set a 12-month review hearing in June 2023.

In its June 2023 review hearing report, the Department stated Mother had been "unable or unwilling" to show behavior change, engage in substance abuse services or dual-diagnosis treatment, undergo psychological evaluation, or confirm her medication management. Mother's mental health struggles led her to act in a dysregulated way during her visits, which were inconsistent.

Grandmother had not finished the process to be assessed for placement, and the Department had begun to investigate placement with M.R.'s maternal grandfather (Grandfather) in Shasta County. The Department recommended that the court terminate reunification services, set a hearing in three months to give it time to clear Grandfather for placement, and set a

---

[5] Nor did any of its later reports filed in this case.

section 366.26 hearing.  After Mother contested the recommendation, the court set a hearing in August 2023.

Before that hearing, M.R.'s foster parents raised concerns about the safety of Grandfather's home and the speed of the proposed transition, and they asked to be considered for permanent placement.  They noted M.R.'s stated wish to stay in Humboldt County near Mother, Jane Doe, and the elementary school to which he was attached.

At the August 2023 hearing, the juvenile court found that, despite having received reasonable reunification services, Mother had made only minimal progress on her case plan.  The court terminated services and set a section 366.26 hearing in December 2023 to select a permanent placement plan.  The court notified Mother of her right to seek writ review of its orders, which she did not do.

**3.  Changes in Proposed Permanent Plan, Mother's Section 388 Petition, and the Section 366.26 Hearing**

In December 2023, the Department advised the court it was changing its recommendation from guardianship by Grandfather to adoption by him, and that it had to serve M.G. by publication.  The court continued the section 366.26 hearing to March 25, 2024.

In a February 2024 report, the Department changed its recommendation again—this time to guardianship by the foster parents.  Amid concerns about the safety of Grandfather's home and his ability to supervise M.R., Grandfather had withdrawn his "Resource Family Approval" application after learning he needed an exemption to qualify.  For her part, in December 2023, Mother had reported that she was "trying to get her medical and mental health treated" and "will need some time to do this, possibly over a year."  Mother supported a guardianship, as it could let her eventually regain custody.

6

The Department stated that the foster parents had provided a safe, loving home in which M.R. was thriving, and they planned to keep him connected to his birth family. The Department also noted that, throughout the case, M.R. had said he "would prefer to live with his mother over anyone else" and, if he could not, would prefer guardianship to adoption, to preserve a chance of returning to Mother's care. The Department opined that guardianship by his foster parents would best serve his interests, while terminating parental rights would impair them.

In a pretrial hearing on February 27, counsel for the Department represented the Department's intent to recommend guardianship by the foster parents, but counsel for M.R. noted his understanding that CDSS, which was preparing an assessment for the section 366.26 hearing (see § 366.22, subd. (c)), had expressed an intent to recommend adoption by the foster parents, not guardianship. Mother's counsel stated she would file a section 388 petition if CDSS did in fact recommend adoption. The court set a hearing on March 13—i.e., 12 days before the scheduled section 366.26 hearing—to clarify the matter. Shortly before the March 13 hearing, the Department submitted the CDSS report, which indeed recommended terminating parental rights and setting a plan of adoption by the foster parents.

CDSS's report stated that M.R. had adjusted well to the foster parents' home but remains "very concerned with [Mother's] status" and "attached to the hope that he will return home to her." Mother had completed 86 of 115 scheduled visits during the proceedings. Mother's behavior and comments during several visits had emotionally harmed M.R. in ways she seemed unable to understand, and M.R. was "parentified," i.e., preoccupied with monitoring Mother's needs and caring for her. CDSS thus found that, while

M.R. and Mother shared an attachment, it was unhealthy for M.R.'s development. CDSS added that M.R. "appears to have substantial emotional ties" to the foster family and removal from their home would be emotionally detrimental. The foster parents had declined to enter a written agreement for M.R. to have ongoing, postadoption contact with his birth family.

In the ICWA section of its report, CDSS stated that the indication of potential Cherokee ancestry came from a 2010–2012 child welfare case involving Jane Doe, for whom the court had found ICWA did not apply. The CDSS report then summarized the Department's ICWA communications with the three federally recognized Cherokee tribes and federal agencies (as described above), at the outset of this proceeding in 2022. The CDSS report further narrated, "[a]lthough [Mother] made herself available to [the Department], there is no record of inquiry regarding her Native American ancestry until December 2023." When given an ICWA inquiry form at that time, Mother had stated she thought she had Indian ancestry but was unsure and did not know what tribes to list; Mother said she would ask relatives but had not returned the form. Finally, CDSS noted it had no documentation of an ICWA inquiry into alleged father M.G.

At the March 13 hearing, the Department recommended adoption by the current caretakers. The next day, Mother filed a section 388 petition to modify the terminating order and to resume reunification services for six months. The petition alleged that after the termination of services, Mother had pursued counseling; that M.R. had said he wanted to live with Mother and did not want to be adopted; and that terminating their relationship would be detrimental to M.R. Mother attached a letter from Mitch Finn, Ph.D., a licensed marital and family therapist who had treated her from December 20, 2023, through February 14, 2024. Finn wrote that Mother had

8

major depressive disorder and polysubstance abuse in remission; her treatment goals had been to abstain from substance use and improve her emotional regulation so as to show competence and regain custody; and, in Finn's professional opinion, she "did show improvement in managing depression and demonstrating motivation for recovery."

On March 22, the Department served an addendum noting that, on March 19, Grandfather had told the Department he had changed positions again and now wished to adopt M.R. The addendum explained that while the Department had initially supported guardianship because it worried the foster parents "may not keep [M.R.] connected to his family," it now agreed adoption by the foster parents was in M.R.'s best interest. The Department noted Mother's inconsistent visitation and ongoing mental health struggles and added that M.R.'s belief that he could return to her after a guardianship was a source of instability for him. The Department reported that the foster parents had "informed [M.R.] he will always stay connected to [his birth] family."

The Department opposed Mother's section 388 petition, arguing it had provided 12 months of services to address her mental health and substance abuse, but she had often "refused to participate." It detailed Mother's failures to pursue court-ordered mental health and substance abuse services, parenting education, and safe housing, as well as her struggles with emotional self-regulation during visits with M.R.

On March 25, the court held an evidentiary hearing on the section 388 petition. Mother was the sole witness. She testified she has bipolar disorder and listed the medications she takes "every day of my life." She testified that, after the juvenile court terminated services, she began seeing Mitch Finn, a dual-diagnosis therapist. Before that, she had "sporadically"

attended group therapy. Mother testified she had stopped seeing Finn because he had "said that I no longer needed his services" as she was "doing well" and was "drug free," and "there was no more he could do for me." Finn had never drug-tested her.

Mother testified that she had resumed attending church and formed supportive relationships there; secured a safe apartment with safe neighbors; had no boyfriend or "people coming in and out" of her home; and had been sober for "several months." She received enough Social Security income to pay rent and buy food. She believed it was in M.R.'s best interest to resume services because "I think we belong together and I know [M.R.'s] needs more than anyone else."

The juvenile court denied the section 388 petition. It noted Mother's history of "not participating in services to help stabilize her mental health, address substance abuse, from the beginning"; her December 2023 statement that "she's not in a position to care for the child" and "needs time to take care of her own needs, which could take over a year"; and her support for guardianship at that time. The court concluded her recent efforts did not amount to a change in circumstance.

While commending Mother for having stated under oath that she was "clean and sober, . . . taking meds, aware of her diagnosis, [and] seems to have some insight," the court found her recent efforts to be "like a cycle more than a change." Noting Mother's many challenges, the court said it must assess whether her efforts reflect "a real change of circumstances where she's going to change her life" or "just another cycle of trying and trying to address it." The court expressed skepticism of Mother's shift from "straight out refusals" to engage in services to saying, "when she's not able to see her child anymore . . . , hold on, I'm doing these things." The court had "no confidence

10

that these things that will be done won't have another year or two cycle and then I have to look at [M.R.]." It concluded, "I'm going to deny the request to modify for those reasons. I do not find clear and convincing evidence of a true change in circumstance."

The court then held the section 366.26 hearing. It found that M.R. was likely to be adopted; ordered Mother's and M.G.'s parental rights terminated; and set a permanent plan of adoption. Mother appealed the orders denying her section 388 petition, terminating parental rights, and designating adoption as M.R.'s permanent plan.

## DISCUSSION

Mother contends the juvenile court erred in two ways: it abused its discretion in denying her section 388 petition to modify the order terminating reunification services because it erroneously applied a "clear and convincing evidence" standard, and it erred in implicitly finding that the Department adequately inquired into whether there is reason to believe M.R. is an Indian child. Mother does not claim any reversible error in the section 366.26. hearing. The Department concedes the court erred in applying a "clear and convincing evidence" standard to Mother's section 388 petition but contends the error was harmless. The Department argues the court did not err in implicitly finding compliance with ICWA, and any error was harmless.

We conclude the court erred regarding ICWA in a way that necessitates a conditional reversal and remand for further proceedings to determine if the error was prejudicial. (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1137–1138.) In those proceedings, the Department must conduct a renewed Cal-ICWA inquiry, and the juvenile court must determine the adequacy of that inquiry and, ultimately, whether ICWA applies. (*Dezi C.*, at pp. 1137–1138.) Because *Dezi C.* requires a remand in any event, and because any assessment of

11

whether the court's standard of proof error caused prejudice would be unavoidably conjectural, the interests of justice dictate that we direct the juvenile court, on remand, to reassess the section 388 petition using the correct standard of proof, based on current circumstances.

As noted, the Department's petition and its detention, jurisdiction, and disposition reports all provided information about its ICWA inquiry, which entailed contacting Cherokee tribes and federal agencies about Mother and M.R. (See pp. 3–5, 8, *ante*.) The juvenile court issued its findings and orders as to the July 2022 disposition hearing on a form in which it checked a box by the text, "The court finds [ICWA] does not apply." On appeal, Mother contends the court erred in thereby implicitly finding that the Department made an adequate inquiry under Cal-ICWA, given the lack of evidence that it asked any of M.R.'s extended family members about his potential Cherokee ancestry. The Department argues that substantial evidence supports the implied finding of adequate inquiry, and any error was harmless. In light of our Supreme Court's recent clarification of the law in *Dezi C.*, *supra*, 16 Cal.5th 1112, issued after the briefing in this appeal, we conclude that substantial evidence does not support an implied finding of adequate inquiry, and the underdeveloped record leaves us unable to assess whether the inadequacy of the inquiry caused prejudice. We must therefore conditionally reverse the order terminating parental rights and remand for the Department to conduct a further Cal-ICWA inquiry and for the juvenile court to assess its adequacy. (*Dezi, C.*, at pp. 1137–1138.)

Congress enacted ICWA to redress "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement." (*Mississippi Choctaw Indians Band v. Holyfield* (1989) 490 U.S. 30, 32.) ICWA set

"minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes," while expressly yielding to "state laws that provide 'a higher standard of protection.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1130, quoting 25 U.S.C. § 1921.) Whether ICWA applies "turns on whether the minor is an Indian child," meaning (a) a member of an Indian tribe or (b) eligible for membership and the biological child of a member. (*Dezi C.*, at pp. 1129–1130, citing 25 U.S.C. § 1903(4).) ICWA requires a court to ask each participant in a custody proceeding if there is "reason to know" the child is or may be an Indian child. (25 U.S.C. § 1912(a).)

After Congress enacted ICWA, "California struggled to comply." (*Dezi C., supra*, 16 Cal.5th at p. 1130.) To improve compliance, our Legislature enacted Cal-ICWA. (*Dezi C.*, at pp. 1130–1131; see Welf & Inst. Code, §§ 224–224.6.) The Legislature later amended Cal-ICWA's inquiry and notice requirements, revising " 'the specific steps a social worker, probation officer, or court is required to take in making an inquiry of a child's possible status as an Indian child.' " (*Dezi C.*, at p. 1131.) As a result, " ' 'agencies now have a broader duty of inquiry and a duty of documentation.' ' " (*Ibid.*, citing § 224.2, subd. (a); see also Cal. Rules of Court, rule 5.481(a).)[6]

Section 224.2 subjects California agencies and courts to an expanded version of the federal duty of inquiry. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1131.) It imposes "an affirmative and continuing duty" in every dependency case to determine if ICWA applies by inquiring if a child is or may be an Indian child. (Welf. & Inst. Code, § 224.2, subd. (a).) Once a child is placed in the temporary custody of a county welfare department, the department's duty "includes, but is not limited to, asking the child, parents, legal guardian,

---

[6] Undesignated rules citations are to the California Rules of Court.

13

Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2); accord, rule 5.481(a)(1) [agency "must ask" listed persons if child is or may be an Indian child].) Cal-ICWA incorporates ICWA's definition of an "extended family member" as a "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).)

If an agency has "reason to believe" a child is an Indian child, it must inquire further by interviewing parents and extended family members and by contacting the BIA, CDSS, relevant tribes, and anyone else who might have information about a child's tribal membership or eligibility. (§ 224.2, subd. (e)(2)(A)–(C); rule 5.481(a)(4).) The agency must send relevant tribes a notice containing information identified by the tribe as necessary to determine membership or eligibility. (§ 224.2, subd. (e)(2)(C).)

If an agency's further inquiry yields a "reason to know"—not just a "reason to believe"—that a child is an Indian child, the agency must give the relevant tribe formal notice of the proceeding. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132, fn. 8 [quoting statutory triggering circumstances]; see § 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).) A juvenile court may find "an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child, so ICWA does not apply." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) A "factual finding that

14

ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' " (*Dezi C.*, at p. 1134, quoting § 224.2, subd. (i)(2).)[7]

The record here lacks substantial evidence that the Department fulfilled its duty to inquire of M.R.'s extended family members about his potential Cherokee ancestry. The record reveals inquiries directed only to the Cherokee tribes, the BIA and Department of the Interior, and, belatedly, Mother. The record shows that the Department communicated about other issues in the case with, at a minimum, M.R.'s maternal relatives Jane Doe, Grandfather, and Grandmother, but it lacks documentation of the Department having made any ICWA inquiry to any of those readily available extended family members.

To defend its inquiry, the Department quotes the majority opinion in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 (*Ezequiel G.*), disapproved in other part by *Dezi C.*, *supra*, 16 Cal.5th at page 1152, footnote 18, which states that "a juvenile court may find an ICWA inquiry was adequate even if an agency has not interviewed some available family members." (*Ezequiel G.*, at p. 1010; but see *id.* at p. 1019 (dis. opn. of Lavin, J.) [agency "did not fulfill its duty to conduct an adequate inquiry . . . because it did not ask [the children's] identified and readily available family members about possible Indian ancestry"].) For two reasons, this reliance is misplaced.

---

[7] As the Supreme Court noted, some Courts of Appeal apply "a straightforward substantial evidence test" to review a finding that ICWA does not apply, while others apply " 'a hybrid standard, reviewing for substantial evidence whether there is reason to know a minor is an Indian child, and reviewing a finding of due diligence and proper inquiry for abuse of discretion.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1135.) The court found it unnecessary to resolve the split over the standard of review. (*Ibid.*) Likewise, we need not take sides on the issue, for we cannot affirm the finding on this record under either standard.

First, *Ezequiel G.* is easily distinguished. In excusing the department's failure to inquire of extended family members, the majority relied entirely on the fact that each parent had "unequivocally denied Indian ancestry," while the mother, on appeal, identified no evidence that could "support an inference that [any parents] might unknowingly be members of an Indian tribe." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1015.) Here, by contrast, the first indication that the minor might be of Indian descent came from his sibling's 2010 case file. But it was not until some 18 months after the Cherokee Nation and a related entity failed to return their ICWA forms in 2022 that the Department first asked Mother about M.R.'s heritage. Despite Mother's explanation that she thought she *did* have Indian ancestry but was unsure and did not know what tribes to list, the Department failed to follow up with relatives who might have been able to provide further information. Nor did the Department ever make contact with M.G., let alone ask him about Indian ancestry.

Second, following *Dezi C.*, the reasoning of the *Ezequiel G.* majority on this point is of limited vitality. The *Ezequiel G.* majority "wholeheartedly" rejected the dissent's premise that "a parent is not a reliable source of [tribal] membership information." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1010.) But *Dezi C.* acknowledged the Legislature's recognition in Cal-ICWA "that parents may not be the best source of information about a child's Indian ancestry" and thus "expressly mandated that, from the outset, child protective agencies expand their investigation of a child's possible Indian status beyond the child's parents." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1139.) The law thus requires " '[a] proper ICWA inquiry with extended family members and others more knowledgeable.' " (*Ibid.*)

16

The *Dezi C.* court did rely on *Ezequiel G.* for a more general proposition: that a "juvenile court's fact-specific determination that an [ICWA] inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141, quoting *Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1005.) But the court then explored the nature of that deference in light of the facts before it. (*Ibid.*) In so doing, the court made clear that appellate review of a finding that an ICWA inquiry was adequate is not so deferential as to permit affirmance on a record like this one. (*Dezi C.*, at p. 1141.)

The court reasoned: " ' "On a well-developed record, the [juvenile] court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes." ' [Citations.] [¶] If . . . a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are . . . supported by sufficient evidence and record documentation as required by California law (rule 5.481(a)(5)), there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child. On the other hand, if the inquiry is inadequate, conditional reversal is required so the agency can cure the error . . . ." (*Dezi*, *supra*, 16 Cal.5th at p. 1142.) In the case before it, the court noted, "the Department's inquiry extended no further than mother and father, both of whom have longstanding issues with substance use disorder, even though their parents, siblings, and father's cousin were readily available and had been interviewed by the Department regarding the allegations of the dependency petitions. The Department's inquiry falls well short of complying with section 224.2, as it concedes." (*Ibid.*)

17

Here, the inquiry falls even further short: The Department did not inquire of M.G. and inquired only belatedly of Mother, who had longstanding issues with mental health. At a minimum, the Department's failure to make and document ICWA inquiries of Grandmother, Grandfather, and Jane Doe during its communications with those extended family members renders its inquiry inadequate under section 224.2 and rule 5.481. Nor does the record reflect efforts by the Department to contact and inquire of the maternal uncle living with Grandfather, the sister whom Mother proposed as a placement, or relatives of M.G.

The Department's brief does not discuss this failure to inquire of M.R.'s maternal extended family. As to M.G., the Department asserts, without citing authority, that because M.G. "never appeared in the case and was therefore never elevated to the status of presumed father," he did not satisfy Cal-ICWA's definition of "parent," so the Department was not obliged to direct an ICWA inquiry to him (or, we infer, his extended family). (See Welf. & Inst. Code, § 224.1, subd. (c)(2) [defining "parent" to include "any biological parent or parents of an Indian child"]; accord, 28 U.S.C. § 1203(9) [ICWA; same definition].) But "alleged father" and "presumed father" are terms of art in dependency law that do not turn on whether a man is a child's "biological parent"—the trigger for a duty of inquiry under Cal-ICWA and ICWA. (See *In re E.O.* (2010) 182 Cal.App.4th 722, 726 [detailing types of "father" in dependency law].)

Below, as we have noted, the Department submitted a copy of a 2013 family support judgment (Fam. Code, § 17430) adjudicating M.G. the father of M.R., which the Department accurately described to the juvenile court as "indicat[ing] that the child's father is, [M.G.]." The judgment states, "The court orders [M.G.] [Mother] are the parents of [M.R.]." The family support

18

judgment establishes that M.G. is M.R.'s biological father. (See *County of Lake v. Palla* (2001) 94 Cal.App.4th 418, 427.) The Department was therefore obliged to include M.G. and those members of his extended family as were available to the Department in its ICWA inquiry. (*Dezi C.*, *supra*, 16 Cal.5th 1112.)[8] The juvenile court's implicit finding of an adequate ICWA inquiry was thus erroneous as to both M.R.'s maternal and his paternal extended family members.

Because that finding was erroneous, *Dezi C.* dictates our prejudice analysis. (See *Dezi C.*, *supra*, 16 Cal.5th at pp. 1135–1137.) Our Supreme Court specified the requisite appellate response to a case like this in detail: "We hold that error resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3. When a Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial. [Citations.] '[U]ntil an agency conducts a proper initial inquiry and makes that information known, it is impossible to know what the inquiry might reveal.' " (*Dezi C.*, at p. 1136.)

In *Dezi C.*, the "sole infirmity in the judgment" was the lack of an adequate Cal-ICWA inquiry, which made it impossible to review for prejudice the juvenile court's erroneous finding that ICWA did not apply. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1137.) Because there was "no indication of any error in the dependency proceedings that would justify the outright reversal of the

---

[8] The record indicates that, early in the proceedings, a social worker spoke by phone with M.G.'s father (i.e., M.R.'s paternal grandfather) in an attempt to notify M.G. of the proceedings; the record does not state if the social worker asked the paternal grandfather about Indian descent.

judgment terminating parental rights," the court held, "full reversal of the section 366.26 judgment is not warranted; rather, a conditional reversal in order to comply with Cal-ICWA is appropriate." (*Ibid.*) "Upon a conditional reversal, the Department will make additional inquiry and documentation efforts consistent with its duties and the court shall hold a hearing thereafter to determine whether, in light of the outcome of the inquiry as documented, ICWA applies. If the juvenile court determines the inquiry is proper, adequate, and duly diligent and concludes that ICWA does not apply, any inquiry error is cured, and the judgment would be reinstated. [Citation.] In contrast, if the inquiry reveals a reason to know the dependent child is an Indian child, the tribe has been notified [citations], and the tribe determines the child is a member or citizen, or eligible for membership or citizenship, of an Indian tribe [citations], ICWA applies, and the judgment must be reversed." (*Ibid.*)

But here, unlike in *Dezi C.*, the proceedings contain another error that led to the order terminating parental rights: the juvenile court undisputedly applied the wrong standard of proof to Mother's section 388 petition, which could have impacted the determination of "changed circumstances."[9] The

---

[9] A parent may, "upon grounds of change of circumstance or new evidence, petition the [juvenile] court . . . for a hearing to change, modify, or set aside any order of court previously made." (§ 388, subd. (a)(1).) " 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) In the procedural posture here, a parent can establish "a substantial change of circumstances for purposes of section 388 by showing that, . . . between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting . . . jurisdiction." (*In re J.M.*, at p. 846.)

standard of proof on a section 388 petition is, with irrelevant exceptions (see § 388, subds. (a)(2), (c)(3), (d)), the preponderance of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re J.M.*, *supra*, 50 Cal.App.5th at p. 845.) In assessing Mother's petition, however, the juvenile court applied a "clear and convincing evidence" standard: "I'm going to deny the request to modify for those reasons. I do not find clear and convincing evidence of a true change in circumstance." As the Department appropriately concedes, this was error. It is an abuse of discretion to require a party to satisfy a higher standard of proof than the law requires. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194 [application of "clear and convincing evidence" standard to § 388 petition].)

But as the Department points out, such an error may be harmless. (*In re L.S.*, *supra*, 230 Cal.App.4th at p. 1194; *In re Riva M.* (1991) 235 Cal.App.3d 403, 412, disagreed with on another ground by *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 342; see also *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213 [error in allocating burden of proof].) Typically, an appellant in a noncriminal case seeking reversal based on a standard of proof error must show "it is reasonably probable the trial court would have [ruled differently on] the petition had it applied the correct standard of proof." (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532.) A "reasonable probability" in this context " ' "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Ibid.*, quoting *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) In a typical case, the juvenile court's error in subjecting Mother's petition to an unduly strict standard of proof would require us to assess whether the error was prejudicial under the foregoing standard (*ibid.*), bearing in mind the substantial difference between the "preponderance of the evidence" and "clear

21

and convincing evidence" standards. (See generally *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 [distinguishing standards of review].)

In this case, however, because we must remand the matter in any event, the interests of justice dictate that we also conditionally reverse the order denying Mother's section 388 petition and include, in our instructions to the juvenile court on remand, a direction to reconsider the petition using the correct standard of proof—and, because six months have passed since the order being appealed, in light of current circumstances. Attempting to determine whether the standard of proof error was harmless because the juvenile court would have denied the petition in any event, even had it applied the correct standard, would "involve[] some degree of conjecture." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.) Under different circumstances, this court must engage in such conjecture to honor the constitutional mandate that we not set a judgment aside unless the error "has resulted in a miscarriage of justice," i.e., prejudice, particularly in dependency cases which emphasize the import of ensuring finality. (Cal. Const., art. VI, § 13; see *People v. Watson* (1956) 46 Cal.2d 818, 836; *Dezi C.*, *supra*, 16 Cal.5th at p. 1142.) But here, because the ICWA error independently requires that the section 366.26 orders be conditionally set aside and the matter remanded for further proceedings, finality is thus unavoidably delayed. (*Dezi C.*, at p. 1137.) In that context, Mother's right to have her petition decided in the first instance by the juvenile court, under the correct legal standard, warrants protection, as the court can reassess the petition without any further delay in the proceeding's finality.[10]

---

[10] We note that, were we to hold that the standard of proof error was harmless, making this case identical in posture to *Dezi C.*, we still would be obliged to conditionally reverse the section 366.26 orders and remand solely

22

# DISPOSITION

The order denying Mother's petition under section 388 and the orders under sections 366.24, 366.26, 727.3, 727.31, both entered on March 27, 2024, are conditionally reversed. The matter is remanded to the juvenile court with directions to ensure that the Department fulfills its duty of inquiry into M.R.'s potential Indian ancestry, maternal and paternal, in accordance with the California statutes implementing the federal Indian Child Welfare Act (Welf. & Inst. Code, §§ 224–224.6), under *Dezi C.* The juvenile court is directed to hold (1) a hearing to assess the adequacy of the Department's investigation and to determine whether M.R. is an "Indian child" for purposes of ICWA (25 U.S.C. §§ 1901 et seq.), and (2) a renewed hearing on Mother's section 388 petition, at which the parties may submit evidence of current circumstances. If the juvenile court determines that the Department's inquiry is adequate and the relevant tribes have indicated that M.R. is not an Indian child, and if the juvenile court does not grant Mother's section 388 petition, then the juvenile court is directed to immediately reinstate the

---

for the juvenile court to determine whether ICWA applies. (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1136–1137.) In that context, it is not clear whether Mother could file a renewed section 388 petition on remand, while the further ICWA inquiry was underway. (See Welf. & Inst. Code, § 388 [authorizing petition by "Any parent or other person having an interest in . . . a dependent child"]; *Dezi C.*, at pp. 1137–1138, 1152 [ordering conditional reversal of order terminating parental rights and stating that, if further inquiry reveals ICWA does not apply, order will be "reinstated"]; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (Rutter Group 2023) ¶ 14.2 [terms of a remittitur "define, and thus can limit, the trial court's jurisdiction to act on remand"].) It is unclear, in other words, whether Mother would have standing under section 388 as a "parent" while the order terminating her parental rights was conditionally reversed but subject to potential "reinstatement." A conditional reversal of the order denying the section 388 petition will avoid any potential need for the juvenile court or this court to assess that complex and novel issue, on which we express no view.

23

orders entered on March 27, 2024. If any tribe indicates that M.R. is an Indian child, or if the juvenile court grants Mother's section 388 petition, then the juvenile court is directed to vacate the orders entered on March 27, 2024, and conduct further proceedings in compliance with the provisions of ICWA.

_____
DESAUTELS, J.

We concur:


_____
STEWART, P.J.


_____
RICHMAN, J.

*In re M.R.* (A170094)